**In the Matter of T.W.R., J.P.M., and P.S.R., Minors.**

No. S–5591.

Supreme Court of Alaska.

Dec. 23, 1994.

Rehearing Denied Jan. 7, 1995.

James M. Hackett, Fairbanks, for appellant. Scott Davis, Asst. Atty. Gen., Fairbanks, and Charles E. Cole, Atty. Gen., Juneau, for appellee.

Thomas E. Fenton, Fairbanks, guardian ad litem.

Before MOORE, C.J., and RABINOWITZ, MATTHEWS and COMPTON, JJ., and BRYNER, Justice pro tem.*

## OPINION

RABINOWITZ, Justice.

### I. INTRODUCTION

After the State claimed that two of her children were children in need of aid and took custody of them, T.R. (the mother) underwent parenting education. When the State concluded that her progress was inadequate, the superior court allowed the State to take custody of the third child, and ultimately terminated T.R.'s parental rights as to all three children. T.R. now appeals. We affirm.

### II. FACTS AND PROCEEDINGS

At the center of this case are three boys: J.P.M., born June 2, 1985; T.W.R., born August 25, 1988; and P.S.R., born April 11,

1991. R.R. is the natural father of T.W.R. and P.S.R. K.M. is the natural father of J.P.M. R.R. relinquished his parental rights to T.W.R. and P.S.R. K.M. did not oppose the State's efforts at any stage of the proceedings, and purportedly told the State that he would consent to adoption by J.P.M.'s foster parents. The mother asserts that her sons should be returned to her custody.

On July 27, 1990, the Alaska Department of Health & Social Services (the Department) filed a petition for temporary custody of T.W.R. and J.P.M., alleging that they were children in need of aid (CINA):

The parents have not been meeting physical, mental, emotional and social needs of their children which has resulted in both children failing to thrive and serious developmental delays. The conditions of filth the children live in are to the extent that even after being in alternative care for a week upon being examined by Dr. Bergeson, [T.W.R.] still has cradle cap and a diaper rash, and [J.P.M.] is off the chart in the past 2 months (no growth).

The petition was signed by Kim L. Brewis, the social worker who had been handling the case.

Brewis, T.R., and R.R.[1] stipulated to temporary custody until October 27, 1990, and acknowledged that "active participation in individual counseling and progress toward addressing the issues" would be necessary if there were to be any hope of the boys being released from state custody. They also acknowledged that the decision whether to return the boys to the parental home would be up to the Department. Under the stipulation, the parents would attend parenting classes, and would be allowed regularly scheduled visits with the boys, arranged by Brewis.

On November 20, 1990, the Department filed a petition for adjudication of CINA status and for temporary custody of T.W.R. and J.P.M. for a period not to exceed two years. The petition noted:

The parents are unable to meet the physical, mental, emotional, and social needs of

---

* Sitting by assignment made pursuant to article IV, section 16 of the Alaska Constitution.

1. In the stipulation, the parents waived their right to counsel.

their children which has resulted in both children failing to thrive and serious developmental delays. [R.R.] is presently incarcerated at [Fairbanks] Correctional Center and [the mother] is unable at this time to meet the needs of her children.

Everyone involved[2] signed a second stipulation waiving a hearing and agreeing that an additional one year of state custody would be in the best interests of the children. R.R. and the mother reaffirmed their willingness to undergo parenting classes and counseling. The superior court entered an order adjudging the children to be in need of aid, and placing them in the Department's custody for a period not to exceed one year.

On November 20, 1991, the Department petitioned for another extension, this time for two years. This petition suggested that R.R. was the primary threat to the children's well-being:

[R.R. and the mother] have not successfully dealt with the abuse their children suffered in counseling. We believe the children are still at risk of being harmed and that [the mother] is unable to protect her children if [R.R.] intended to do them harm. We believe further services are necessary to assure the children's [safety]. Services are to include anger and stress management, continued individual and joint counseling, foster care for the minors, and further parenting education.

Brewis's annual report recommended continuation of the status quo, and listed the expected date of the children's return to the parental home as "[u]ncertain and dependent on the parents [sic] understanding and meeting the needs of their children and providing a safe and nurturing home for them." The guardian ad litem (GAL) filed a report that also placed blame on R.R., quoting a psychological profile of him that stated that all parties would have "blood on their hands" if the boys were returned.

In January 1992, T.R., R.R., and K.M. stipulated to another year of state custody, and the superior court entered an order consistent with that stipulation. The mother

requested overnight visits. Brewis filed an affidavit on April 6, 1992 that stated:

We do not believe substantial progress has been made by [R.R.] in complying with the terms of the stipulation.

[If R.R. were present,] [w]e do not believe [the mother] would supervise closely enough and would be unable to overrule [R.R.] in the children's behalf to protect them if necessary.

The superior court ordered the Department to permit an overnight visitation between T.R. and the children "provided that [R.R.] is not in the home and has no contact with the children."

On June 24, 1992, R.R. filed a relinquishment of parental rights to T.W.R. On the same day, the Department filed a petition for temporary custody of the third son, P.S.R., and for a CINA determination as to P.S.R. The petition stated that P.S.R. had been ill for approximately two months, and that T.R. and R.R. appeared "to be unable to provide the physical and emotional nurturance and or the medical care required for the minor to recover." T.R. did not oppose thirty-day temporary custody for the Department. The superior court granted the Department temporary custody for thirty days.

Thereafter T.R. moved for regular unsupervised visitations. The GAL and the Department opposed this motion. The GAL informed the court, additionally, that P.S.R. was failing to thrive, and that the GAL believed that T.R. was unable to care for any of her children. Therefore, the GAL recommended termination of T.R.'s parental rights. As noted above, until that point, the goal of T.R. and the State had been the return of the boys to T.R.

A temporary custody hearing was then held, at which the parties requested a trial on the issue of termination of T.R.'s parental rights. The parties also stipulated to an extension of state custody until the conclusion of the trial. The case was set for trial for the week of November 16, 1992, and temporary custody was extended through the

2. This included the mother, her attorney, R.R., his attorney, K.M., the guardian ad litem, Brewis, and the Department's attorney. K.M. waived his right to counsel.

superior court's resolution of the termination question.

R.R. filed a second relinquishment of parental rights, this time to both T.W.R. and P.S.R., and the superior court ordered the rights relinquished. On September 21, 1992, the Department filed a petition seeking an adjudication of P.S.R.'s CINA status, and requesting temporary custody for a period not to exceed two years. On the same day, the Department also filed a petition asking the superior court to terminate the parental rights of K.M. and T.R., on the basis that K.M. had no interest in maintaining a parent-child relationship with J.P.M. and that T.R. was unable to meet her children's needs. The GAL agreed, finding that all of the children had failed to thrive under T.R.'s care, and concluding that T.R. "learned nothing from all of the services provided to her."

After a trial, the superior court entered an order adjudicating P.S.R. to be a child in need of aid, and terminating T.R.'s parental rights as to all three boys. It found by clear and convincing evidence that each of the children was a child in need of aid. While acknowledging that the mother loved her children, the superior court concluded that she could not meet their needs, and that there were no other family members willing and able to give the three children an appropriate level of care. T.R. then filed notice of appeal. On appeal, T.R. argues that: (1) the superior court failed to make sufficient findings to satisfy CINA Rule 15(g); (2) she complied with the treatment plans; (3) she was denied substantive due process of law; (4) the term "failure to thrive" is unconstitutionally vague; and (5) the superior court erred when it found that her sons were children in need of aid and that this condition would continue indefinitely if they were left in T.R.'s care.

## III. DISCUSSION

### A. Standard of Review

■ We interpret statutory language *de novo*. *Langdon v. Champion*, 745 P.2d 1371, 1372 n. 2 (Alaska 1987). When the superior court has determined that a minor is a child in need of aid, we will overturn the factual findings in support of that determination only if they are clearly erroneous. *A.H. v. State*, 779 P.2d 1229, 1231 (Alaska 1989). Factual findings are clearly erroneous if, after reviewing the evidence, we are left with the definite and firm conviction that the trial court has made a mistake. *Evans v. Evans*, 869 P.2d 478, 479 (Alaska 1994).

### B. CINA Rule 15(g)

■ T.R. argues that the superior court's findings were inadequate under CINA Rule 15(g) as interpreted by *In re J.L.F.*, 828 P.2d 166 (Alaska 1992). Rule 15(g) states:

> **Additional Findings.** In any case in which the court has authorized the Department to remove the child from the child's home, or continued a previous order for removal, the court shall make findings pursuant to 42 U.S.C. § 671(a)(15) as to whether, under the circumstances of the case, reasonable efforts were made to prevent or eliminate the need for removal of the child from the home and to make it possible for the child to return to the home.

In *J.L.F.*, we held that Rule 15(g) requires an explicit finding of reasonableness. *J.L.F.*, 828 P.2d at 172. There, the superior court made no mention of the reasonableness of the treatment plan, noting simply that the mother had complied with the plan but was still unable to care for her children. *See In re J.L.F.*, No. 3AN 88–589/590 CP (Alaska Super.1990). We therefore remanded the case to the superior court for such a finding. *J.L.F.*, 828 P.2d at 172.

Here the superior court was aware of its responsibilities and adequately complied with Rule 15(g). Its January 1992 order, as amended, stated that the Department was "making reasonable efforts to make it possible for the children to be returned to their parental home." In its findings relating to, and order for, temporary custody of P.S.R., the superior court stated that "[r]easonable efforts have been made to avoid the need for removal of the child from the home." Additionally, the superior court made a more general oral finding in reference to all three boys:

I believe these findings address the facts, the burden, the availability of what's been, the services, the unavailability of the family. *If I've not stated it expressly, reasonable efforts, extensive efforts were made by a wealth of people.*

(Emphasis added). We therefore conclude that the superior court's findings satisfy CINA Rule 15(g).

### C. *Compliance with Treatment Plans*

■ T.R. argues that she complied with her treatment plans. That, however, does not make the outcome below erroneous. In its findings the superior court acknowledged that T.R. had been complying with the treatment plan, but concluded that her efforts had failed to translate into adequate parenting skills.

### D. *The Finding That the Children Were in Need of Aid*

■ In order to terminate parental rights under AS 47.10.080, a court must find by clear and convincing evidence (1) that there is a child in need of aid under AS 47.10.010(a)(2) as a result of parental conduct, and (2) that the parental conduct causing the child to be in need of aid is likely to continue. *K.T.E. v. State*, 689 P.2d 472 (Alaska 1984). The superior court found that all three boys were children in need of aid pursuant to AS 47.10.010(a)(2)(A), (B) and (C) based on clear and convincing evidence.[3] A finding under any of these sections alone is enough for CINA status.[4]

### 1. *No Parent Willing to Provide Care*

■ T.R. states that "[o]bviously, the mother was (is) 'caring' and 'willing to provide care' for her sons." This court has given AS 47.10.010(a)(2)(A) a broader interpretation than simple unwillingness to care: "[A] finding of inability to care would be grounds for jurisdiction under subsection (2)(A). . . ." *J.L.F.*, 828 P.2d at 170.

■ The superior court found by clear and convincing evidence that T.R. was unable to care for her minor children. They all had serious physical, social, and cognitive problems. For example: at times they were filthy and smelled of urine and excrement; while in the care of T.R., J.P.M.'s physical development was poor; T.W.R. was sick and listless when he left his mother's care; and J.P.M. showed indications of attention deficit disorder, the signs of which suggested that it was "situational" rather than genetic. These conditions changed dramatically after the children entered foster care.

There was also evidence that the children's social development lagged behind that of their peers. T.W.R. was very quiet. J.P.M. and T.W.R. were violent with each other; early in their foster care, the foster parents observed J.P.M. say "me kill you" and try to choke T.W.R. The boys had serious academic problems while they lived with their mother. Once again, the boys made significant progress with foster care.

---

**3.** Alaska Statute 47.10.010(a)(2)(A)–(C) provides that a minor may be a child in need of aid as a result of:

 (A) the child being habitually absent from home or refusing to accept available care, or having no parent, guardian, custodian, or relative caring or willing to provide care, including physical abandonment by
 (i) both parents,
 (ii) the surviving parent, or
 (iii) one parent if the other parent's rights and responsibilities have been terminated under AS 25.23.180(c) or AS 47.10.080 or voluntarily relinquished;
 (B) the child being in need of medical treatment to cure, alleviate, or prevent substantial physical harm, or in need of treatment for mental harm as evidenced by failure to thrive, severe anxiety, depression, withdrawal, or untoward aggressive behavior or hostility toward

others, and the child's parent, guardian, or custodian has knowingly failed to provide the treatment;
 (C) the child having suffered substantial physical harm or if there is an imminent and substantial risk that the child will suffer such harm as a result of the actions done by or conditions created by the child's parent, guardian, or custodian or the failure of the parent, guardian, or custodian adequately to supervise the child. . . .

**4.** Because we hold *infra* that the superior court was correct in finding CINA status under subsections AS 47.10.010(a)(2)(A) and (B), it is unnecessary to consider whether the superior court erred in finding that CINA status was conferred under subsection (C).

### 2. *Medical Attention*

■ The superior court also concluded that T.R. had knowingly failed to provide the medical treatment the children needed. Although T.R. lists actions she took, medical and otherwise, to care for her sons, the relevant concern under AS 47.10.010(a)(2)(B) is whether the children were in need of treatment that T.R. knowingly failed to provide. No party is claiming that T.R. always failed to care for her sons, only that there were enough instances of such failures to raise questions concerning her fitness as a parent.

Subsection (B) speaks to physical and emotional neglect. There is abundant evidence in the record of both. T.W.R had cradle cap and a rash over his whole body. J.P.M. was anemic. He had emotional problems as well, being diagnosed as suffering from emotional dwarfism, a non-organic form of failure to thrive. Doctors worried that all of T.R.'s children might be failing to thrive.[5] Yet they all made rapid gains after being taken from T.R.'s care and placed in foster homes. In addition to the physical neglect discussed above, Dr. Bergeson found a rectal fissure and suspected sexual abuse of P.S.R., though he could not be certain.

■ T.R. also states that Dr. Andreassen, the primary care physician for the boys, "never had any concern that the mother was neglecting or abusing her sons." However, it was not erroneous for the superior court to attach more weight to the testimony of the witnesses who described the signs of ne-glect—and later improvement—that they observed. "[A]ssessing witness credibility is a trial-court function" and a superior court which credits one version over another is acting within its discretion. *Hanlon v. Hanlon*, 871 P.2d 229, 232 (Alaska 1994); *Parker v. Northern Mixing Co.*, 756 P.2d 881, 892 (Alaska 1988).

### E. *The Likelihood That the Mother's Neglect Would Continue*

■ The superior court's finding that the mother's neglect was likely to continue was not clearly erroneous. The court addressed this second prong, required by AS 47.10.080(c)(3), by finding by clear and convincing evidence that T.R.'s parental conduct, which caused the three boys to be children in need of aid, was likely to continue if her parental rights were not terminated.[6]

Although it is undisputed that T.R. complied with her case plans, as noted above, such compliance does not ensure that she could provide the children with appropriate levels of care. Despite the fact that T.R. showed some improvement after several years of assistance, the court did not exceed its authority by holding that she did not progress enough. *See, e.g., R.C. v. State*, 760 P.2d 501 (Alaska 1988). T.R.'s progress had been minimal. Social workers who attempted to assist T.R. testified that she had a very limited ability to integrate new concepts into her relationships with her children. Al-

---

**5.** T.R. argues that the term "failure to thrive" is unconstitutionally vague. The superior court, however, based its ruling on a wide variety of physical and emotional harm that it found to have occurred and to be likely to continue if custody of the boys remained with T.R. Thus, even if this portion of the statute were found to be void for vagueness, CINA status would still be appropriate under AS 47.10.010(a)(2)(B). Since a favorable ruling on this point would not affect the outcome of the case, we need not address this contention.

**6.** One of the purposes of Title 47 of the Alaska Statutes is to secure care and guidance for each child, preferably in the child's own home. This policy is stated in AS 47.05.060:

**Purpose and policy relating to children.** The purpose of this title as it relates to children is to secure for each child the care and guidance, preferably in the child's own home, that will serve the moral, emotional, mental, and physical welfare of the child and the best interests of the community; to preserve and strengthen the child's family ties unless efforts to preserve and strengthen the ties are likely to result in physical or emotional damage to the child, removing the child from the custody of the parents only as a last resort when the child's welfare or safety or the protection of the public cannot be adequately safeguarded without removal; and when the child is removed from the family, to secure for the child adequate custody and care and adequate planning for permanent placement of the child.

T.R. briefly argues that the superior court failed to take AS 47.05.060 into account. However, we believe that the superior court's determination that T.R. was, and would likely continue to be, unable to care for her children is consistent with AS 47.05.060.

though T.R. showed some improvement after several years of assistance, her progress overall was "minimal." She was described as a very anxious woman, and this anxiety interfered with all aspects of her life. Her divorce eliminated one source of anxiety, but not the more basic problems with her parenting skills.

In a July 1992 affidavit, Brewis stated that T.R. had difficulty focusing her attention on the boys during visits. The affidavit documented numerous examples of neglect, and provided strong evidence that even after social workers had given her years of assistance and her husband had left, T.R. remained unable to care for her children.

The GAL stated that T.R. had "learned nothing" from all the counseling the Department gave her. Perhaps the strongest evidence that it was unlikely she would ever be able to take proper care of the children was that two years after the Department intervened, she was neglecting P.S.R., the youngest boy.

### F. Substantive Due Process

Finally, we address T.R.'s argument that the State denied her substantive due process of law by discontinuing services in early July 1992, despite some indications that the situation was improving. Her argument is not entirely clear, and she cites to no authority demonstrating that any of the State's actions constituted a violation of substantive due process.

 This court has held that "[t]he private interest of a parent whose parental rights may be terminated is of the highest order." *J.L.F.*, 828 P.2d at 170; *see also In re K.L.J.*, 813 P.2d 276, 279 (Alaska 1991). However, parental rights may be terminated where such steps are necessary to protect the welfare, health and even lives of the children. This is a situation where the State's interest in the welfare of the children involved, outweighs the interest of the parents. The superior court found by clear and convincing evidence that despite her progress, T.R. had demonstrated an inability to care for her children which could not be cured in the foreseeable future or soon enough to allow her to care for her children without exposing them to a risk of abuse and neglect. In such a situation it is not arbitrary to terminate parental rights.[7]

In addition, T.R. argues that the Department's decision to take emergency custody of P.S.R. on June 24, 1992 deprived her of substantive due process. She waived this argument by agreeing to temporary custody.[8]

### IV. CONCLUSION

The record furnishes sufficient evidence of neglect such that we are not left with a definite and firm conviction that the superior court erred in any of its findings of fact or in its ultimate conclusion that .T.R.'s parental rights should be terminated. We therefore AFFIRM the termination decision of the superior court.

---

7. The factual basis of the decision to terminate support services and parental rights is discussed *supra* in Parts III.E. and F.

8. Additionally, there does appear to be a factual basis for the decision. Alaska Statute 47.10.142(a)(2) authorizes the Department to take emergency custody of a minor upon discovering that "the minor has been grossly neglected by the minor's parents or guardian ... and the department determines that immediate removal from the minor's surroundings is necessary to protect the minor's life or provide immediate necessary medical attention."

There was evidence the mother neglected P.S.R.'s emotional, nutritional, and medical needs. His condition improved markedly once he entered foster care.