912 P.2d 1235 (1996)
In the Matter of S.A., DOB: 8/4/89, D.A., DOB: 7/18/90, Minors under the Age of Eighteen (18) Years.
N.A., Appellant,
v.
STATE of Alaska, Appellee.
No. S-6619.
Supreme Court of Alaska.
January 26, 1996.
Rehearing Denied April 12, 1996.
Robert S. Noreen, Michelle McComb, Law Offices of Robert S. Noreen, Fairbanks, for Appellant.
Karla Taylor-Welch, Assistant Attorney General, Fairbanks, Bruce M. Botelho, Attorney General, Juneau, for Appellee.
Before MOORE, C.J., and RABINOWITZ, MATTHEWS, COMPTON and EASTAUGH, JJ.

*1236 OPINION

MATTHEWS, Justice.
N.A. appeals the termination of her parental rights over S.A. and D.A.N.A. originally lost custody of S.A. and D.A. because she was unable to take care of them due to alcohol abuse. N.A. later entered alcohol rehabilitation and has been sober for two years. Nevertheless, the superior court terminated her parental rights.
This case requires us to resolve a conflict in our prior decisions concerning the interpretation of AS 47.10.010(a)(2), the statute which governs when a child may be adjudicated to be a child in need of aid (CINA). We must determine which subsections of AS 47.10.010(a)(2) permit a CINA adjudication based on a parent's or caregiver's inability to care for a child.

I. FACTS AND PROCEEDINGS

N.A. is the mother of two boys, S.A., born August 4, 1989, and D.A., born July 18, 1990. The father of both children is R.S. S.A. and D.A. are developmentally delayed. Their most significant delays are in the area of speech. Until 1992, N.A. abused alcohol. At times, her alcohol abuse made her incapable of taking care of her children.
The State filed a petition for temporary custody of S.A. and D.A. in June 1991. The superior court granted the petition, adjudicated the boys CINA, and committed them to the custody of the Department of Health and Social Services (DHSS). Custody was given to the State because N.A. was unable to take care of the boys at times because of intoxication, and R.S. was in sexual abuse treatment which prohibited him from having unsupervised contact with children. S.A. and D.A. were eventually placed with foster parents.
In November 1992, N.A., again pregnant by R.S., entered the Dena A. Coy Center for Pregnant Women. N.A. stayed at Dena A. Coy until June 1993. She received alcohol rehabilitation, parenting training, and other services there. N.A. stopped using alcohol near the time she entered Dena A. Coy, and had been sober for two years at the time of trial.
Sh.A., a female, was born to N.A. at Dena A. Coy in May 1993. N.A. has had continuous custody over Sh.A. Social workers who worked with N.A. testified that N.A. is a good parent to Sh.A., and the State admits that N.A. is able to meet Sh.A.'s needs.
After leaving Dena A. Coy, N.A. utilized numerous, extensive services to help her maintain sobriety and improve her parenting skills. She attended Alcoholics Anonymous meetings and received other services to prevent a relapse into alcohol abuse. She regularly worked with several counselors on her parenting.
*1237 Despite N.A.'s progress, the State filed a petition for termination of her parental rights over S.A. and D.A. in September 1993, contending that "[t]he boys' needs are great and they need highly skilled parents to raise them in a healthy manner to their potential" and that N.A.'s "gains ... are not sufficient to parent the boys." The trial took place in August 1994. R.S. relinquished his parental rights at the beginning of the trial. N.A. and R.S. were no longer in a romantic relationship at the time of trial.
At trial, the State presented three types of evidence in order to make a case that S.A. and D.A. would suffer harm in N.A.'s care. First, the State introduced testimony that the boys' progress in overcoming their developmental delays would lessen under N.A.'s care because N.A. is not able to provide the boys with "structure and consistency." Second, there was evidence that N.A. sometimes disciplines the boys by yelling at them. Third, witnesses for the State testified that they were concerned that S.A. or D.A. could suffer physical injury as a result of encountering an environmental hazard in N.A.'s care. The superior court terminated N.A.'s parental rights over S.A. and D.A.

II. STANDARD OF REVIEW

Under AS 47.10.080(c)(3), a superior court may terminate parental rights only "upon a showing in the adjudication by clear and convincing evidence that there is a child in need of aid under AS 47.10.010(a)(2) as a result of parental conduct and upon a showing in the disposition by clear and convincing evidence that the parental conduct is likely to continue." The superior court found by clear and convincing evidence that S.A. and D.A. are children in need of aid under AS 47.10.010(a)(2)(A) and (C) as a result of conduct by N.A. which is likely to continue. N.A. argues that the superior court erred in making this finding.
In a CINA case, we will overturn the superior court's findings of facts if they are clearly erroneous. We will declare a trial court's findings to be clearly erroneous if a review of the entire record leaves us with a definite and firm conviction that a mistake has been made. See In re T.W.R., 887 P.2d 941, 944 (Alaska 1994); K.N. v. State, 856 P.2d 468, 475 (Alaska 1993). Determinations of law are reviewed de novo. E.g., Langdon v. Champion, 745 P.2d 1371, 1372 n. 2 (Alaska 1987).

III. IMMINENT AND SUBSTANTIAL RISK OF SUBSTANTIAL PHYSICAL HARM

We will consider whether the superior court clearly erred by adjudicating S.A. and D.A. CINA under AS 47.10.010(a)(2)(C) (subsection (C)) before discussing AS 47.10.010(a)(2)(A) (subsection (A)). A child can be declared CINA under subsection (C) upon a showing of
the child having suffered substantial physical harm or if there is an imminent and substantial risk that the child will suffer such harm as a result of the actions done by or conditions created by the child's parent, guardian, or custodian or the failure of the parent, guardian, or custodian adequately to supervise the child[.]
(Emphasis added.) A careful and thorough review of the entire record leaves us with a definite and firm conviction that the record cannot support a finding that S.A. and D.A. have suffered substantial physical harm as a result of parental conduct which is likely to continue or that there is an imminent and substantial risk that they will suffer such harm due to conduct by N.A. which is likely to continue.
The evidence presented by the State that N.A. is unable to provide her sons with sufficient "structure and consistency" cannot support a CINA adjudication under subsection (C). The only consequence that the State's witnesses predicted would flow from a failure to give S.A. and D.A. the necessary "structure and consistency" was that the boys would not "meet their potential" or make the kinds of gains in overcoming their developmental delays which they would make otherwise. If S.A. and D.A. would indeed suffer this type of harm under N.A.'s care, the *1238 harm would be gradual and not imminent, and it would not be substantial physical harm. The State's witnesses did not identify any concrete physical harms that the boys would suffer as a result of not being supplied with enough "structure and consistency."
Likewise, the testimony that N.A. sometimes disciplines S.A. and D.A. by yelling at them cannot justify a CINA adjudication under subsection (C). According to the State's witnesses, this manner of disciplining the boys could cause them to suffer a loss of self-esteem. The possibility of a gradual loss of self-esteem does not amount to an imminent risk of substantial physical harm.[1]
Finally, some of the State's witnesses had concerns about the physical safety of S.A. and D.A. in N.A.'s care, as the boys are very active and may enter dangerous places in their environment if not watched. But the State introduced no evidence that N.A. was so unaware of potential dangers that it was likely that S.A. or D.A. would be seriously injured as a result of encountering an environmental hazard in her care. The State's witnesses did not testify that the boys were ever in any immediate danger under N.A.'s care; in fact, there was testimony that N.A. removed her sons from potentially dangerous situations. The State only presented testimony that N.A.'s awareness of possible dangers was not as great as that of the social workers observing her, and that N.A. was not able to keep her attention focused on S.A., D.A., and Sh.A. all of the time.[2] The record in this case thus cannot support a finding that S.A. and D.A. would face an imminent and substantial risk of substantial physical harm as a result of the possibility of encountering a physical hazard in N.A.'s care, and the superior court's CINA adjudication under subsection (C) is reversed.[3]

IV. ABILITY TO CARE

Since the superior court's CINA adjudication cannot be upheld under subsection *1239 (C), we must determine whether it can be justified under subsection (A). Subsection (A) permits a child to be declared CINA as a result of
the child being habitually absent from home or refusing to accept available care, or having no parent, guardian, custodian, or relative caring or willing to provide care, including physical abandonment by
(i) both parents
(ii) the surviving parent, or
(iii) one parent if the other parent's rights and responsibilities have been terminated under AS 25.23.180(c) or AS 47.10.080 or voluntarily relinquished[.]
(Emphasis added.) The superior court's decision that S.A. and D.A. are CINA under subsection (A) as a result of parental conduct which is likely to continue is based on a finding that N.A. cannot provide the care required by the boys and cannot meet their needs.[4] This finding raises the issue of whether a parent's inability to care for a child can support a CINA declaration under subsection (A) if the parent is willing to care for the child.
Our prior decisions conflict in their resolution of this issue. In In re J.L.F., 828 P.2d 166, 170 (Alaska 1992), we stated, without analysis: "While a finding of inability to care would be grounds for jurisdiction under subsection (2)(A), that finding must also extend to any relatives who are in fact caring for or willing to assume care." We cautioned, however, that "adjudication under subsection (2)(A) normally would arise under abandonment." Id. at 170 n. 9. In A.M. v. State, 891 P.2d 815, 824 (Alaska 1995), and In re T.W.R., 887 P.2d 941, 945 (Alaska 1994), we interpreted J.L.F., again without analysis, as meaning that a CINA adjudication under subsection (A) may be predicated on a parent's lack of ability to care for a child.
But in F.T. v. State, 862 P.2d 857, 861 (Alaska 1993), we rejected an argument that inability to care could support a finding that a child is CINA under subsection (A). We stated, "AS 47.10.010(a)(2)(A) would support a CINA adjudication only if [the child] had no parent, guardian, custodian, or relative caring or willing to provide care. Specifically, the parties' dispute whether [the parent] was willing to provide care." Id. The State argued "that [the parent] could not have been willing to provide care because he was unable to meet [the child's] needs." Id. We rebuffed this argument and the State's "conclusion that if a child has needs a parent cannot meet, then the parent cannot be `willing to provide care' for that child." Id. We explained that "the State's conflation of willingness to care and ability to satisfy needs leads to absurd conclusions." Id.
We now determine that the approach taken in F.T. is the correct one, and we hold that a parent's or caregiver's inability to care for a child cannot support a CINA adjudication under subsection (A) if the parent or caregiver is willing to care for the child. Our conclusion is based on the plain language of subsection (A) and a careful examination of the structure and purposes of AS 47.10.010(a)(2) as a whole.
The clear language of subsection (A) covers only willingness to care, not ability to care. Subsection (A) allows a CINA adjudication if there is no "parent ... caring or willing to provide care." (Emphasis added.) Subsection (A) does not state "having no parent ... caring and willing to provide care."
The State has argued that subsection (A) covers ability to care because AS 47.10.990(1) states, "`care' or `caring' under AS 47.10.010(a)(2)(A) ... means to provide for the physical, emotional, mental, and social *1240 needs of the child." See F.T., 862 P.2d at 861 & n. 5; J.L.F., 828 P.2d at 169. However, plugging the definition in AS 47.10.990(1) into subsection (A) results in the following: "having no parent ... providing for the physical, emotional, mental, and social needs of the child or willing to provide for the physical, emotional, mental, and social needs of the child." The statute still would not require ability to care  willingness is enough.
An analysis of the structure and purposes of the entirety of AS 47.10.010(a)(2) shows that while ability to care is relevant under subsections (B) through (F) of the statute, it is not relevant under subsection (A), for three main reasons. First, the State's interpretation of subsection (A) would permit CINA adjudications based on parenting deficiencies much less severe than those covered under AS 47.10.010(a)(2)(B)-(F). Second, unlike subsection (A), subsections (B) through (F) set clear, specific standards for adjudicating a child CINA based on a parent's inability to care. Third, permitting ability to care to be considered under subsection (A) would make subsections (B) through (F) virtually superfluous.
The full text of AS 47.10.010(a)(2) states:
(a) Proceedings relating to a minor under 18 years of age residing or found in the state are governed by this chapter, except as otherwise provided in this chapter, when the court finds the minor
....
(2) to be a child in need of aid as a result of
(A) the child being habitually absent from home or refusing to accept available care, or having no parent, guardian, custodian, or relative caring or willing to provide care, including physical abandonment by
(i) both parents
(ii) the surviving parent, or
(iii) one parent if the other parent's rights and responsibilities have been terminated under AS 25.23.180(c) or AS 47.10.080 or voluntarily relinquished;
(B) the child being in need of medical treatment to cure, alleviate, or prevent substantial physical harm, or in need of treatment for mental harm as evidenced by failure to thrive, severe anxiety, depression, withdrawal, or untoward aggressive behavior or hostility toward others, and the child's parent, guardian, or custodian has knowingly failed to provide the treatment;
(C) the child having suffered substantial physical harm or if there is an imminent and substantial risk that the child will suffer such harm as a result of the actions done by or conditions created by the child's parent, guardian, or custodian or the failure of the parent, guardian, or custodian adequately to supervise the child;
(D) the child having been, or being in imminent and substantial danger of being, sexually abused either by the child's parent, guardian, or custodian, or as a result of conditions created by the child's parent, guardian, or custodian, or by the failure of the parent, guardian, or custodian adequately to supervise the child;
(E) the child committing delinquent acts as a result of pressure, guidance, or approval from the child's parents, guardian, or custodian;
(F) the child having suffered substantial physical abuse or neglect as a result of conditions created by the child's parent, guardian, or custodian.
Under subsections (B) through (F), only serious forms of parental misconduct can support a CINA adjudication. Subsection (B) deals with failure to provide needed medical treatment. Subsection (C) concerns "substantial physical harm" caused by parental conduct. Subsection (D) addresses sexual abuse. Subsection (E) is about parental encouragement of criminal conduct. And subsection (F) speaks of "substantial physical abuse or neglect." The legislature thus intended for the State to be able to assume custody of minors only to remedy severe parenting deficiencies and prevent significant harm to children.
*1241 But the State's reading of subsection (A) would give the State the power to assume custody over children for much less serious types of parental misconduct and harm to children. The State would define ability to care as the ability to provide for the physical, emotional, mental, and social needs of a child, relying on AS 47.10.990(1). See F.T., 862 P.2d at 861 & n. 5; J.L.F., 828 P.2d at 169. This interpretation would permit the State to assume custody over any child who had needs the child's parents could not meet. Applied to the facts of this case, the State's interpretation would justify terminating N.A.'s parental rights on the grounds that S.A. and D.A. would not "meet their potential" with N.A. because she would not be able to satisfy their needs for "structure and consistency."
The better way to interpret subsection (A) is in accordance with its plain intent  subsection (A) is designed to deal with situations where the parent abandons the child, the child runs away, or the child refuses to accept the parent's care. The seriousness of these kinds of situations is congruent with the types of circumstances covered by subsections (B) through (F).
Unlike subsection (A), which focuses on a parent's willingness to care and does not explicitly give superior courts guidance in determining what constitutes inability to care, subsections (B) through (F) contain specific standards for adjudicating a child CINA and terminating parental rights based on a parent's or caregiver's[5] inability to care. Under subsection (B), inability to provide needed medical treatment can support a CINA finding. Subsection (C) covers inability to care that causes, or creates an imminent and substantial risk of, substantial physical harm. Subsection (D) deals with sexual abuse or a danger of sexual abuse caused by a parent's inability to supervise a child or by other conditions created by the parent. Subsection (E) permits a CINA adjudication if a parent approves the commission of delinquent acts by the child. Subsection (F) concerns "substantial physical ... neglect."
Reading subsection (A) as permitting a CINA adjudication based on inability to care would make all these parts of subsections (B) through (F) superfluous. A superior court would not have to determine whether the requirements in subsections (B) through (F) were met if the court could easily declare a child CINA upon a general finding of inability to care under subsection (A).[6] Such a result would violate basic principles of statutory construction. See, e.g., Journey v. State, 895 P.2d 955, 959 n. 10 (Alaska 1995) ("as a general rule, statute should be construed so that effect is given to all its provisions and no part is inoperative or superfluous, void or insignificant") (citing Homer Elec. Ass'n v. Towsley, 841 P.2d 1042, 1045 (Alaska 1992)).
For these reasons, we overrule A.M., 891 P.2d at 824, T.W.R., 887 P.2d at 945, and J.L.F., 828 P.2d at 170, to the limited extent that those cases stated that ability to care may be considered under subsection (A). We continue to follow the central teaching of those cases  parental rights may be terminated because a parent is unable to care for a child.[7] We only clarify that superior courts *1242 should be guided by the specific, explicit standards of subsections (B) through (F) in determining whether a parent or caregiver is able to care for a child.
Since a child may not be adjudicated CINA under subsection (A) based on a parent's inability to care for the child if the parent is willing to care for the child, we overturn the superior court's finding that S.A. and D.A. are CINA under subsection (A). We realize that our opinions in A.M., J.L.F., and T.W.R. may have led some superior courts to make CINA findings solely under subsection (A) and not address subsections (B) through (F) in cases where the evidence would support a CINA adjudication under subsections (B) through (F). If this were such a case, the proper remedy would be to remand for consideration of whether the children are CINA under the appropriate provision(s) in subsections (B) through (F). However, the record in this case cannot support a CINA adjudication under subsections (B) through (F), meaning that the termination of N.A.'s parental rights must be reversed.[8]

V. CONCLUSION

We hold that a child may not be adjudicated CINA under AS 47.10.010(a)(2)(A) on the grounds that the child's parent or caregiver is unable to care for the child if the parent or caregiver is willing to care for the child. A parent's or caregiver's ability to care may be considered under the specific, explicit standards of AS 47.10.010(a)(2)(B)-(F). We thus overturn the superior court's determination that S.A. and D.A. are CINA under AS 47.10.010(a)(2)(A). We also conclude that the superior court's holding that S.A. and D.A. are CINA under AS 47.10.010(a)(2)(C) is erroneous. The record cannot support a CINA adjudication under any other subsection of AS 47.10.010(a)(2). The termination of N.A.'s parental rights is REVERSED.
EASTAUGH, J., with whom COMPTON, J., joins, concurs in part and dissents in part.
EASTAUGH, Justice, with whom COMPTON, Justice, joins, concurring in part and dissenting in part.
I agree with Parts I, II and III of the court's opinion.
I disagree with Part IV of the court's opinion because I conclude that ability to care is a relevant consideration under AS 47.10.010(a)(2)(A). I nonetheless agree that on the facts presented here the trial court erred in relying on AS 47.10.010(a)(2)(A) as one basis for CINA jurisdiction. Consequently, the result reached by this court is appropriate.
*1243 The court announces three main grounds for its conclusion that ability to care is irrelevant to AS 47.10.010(a)(2).[1] Opinion at 1239. First, it asserts that a contrary interpretation of subsection (A) "would permit CINA adjudications based on parenting deficiencies much less severe" than those covered under subsections (B) through (F). Second, it asserts that unlike subsection (A), subsections (B) through (F) set "clear, specific standards for adjudicating a child CINA based on a parent's inability to care." Third, it argues that considering ability to care under subsection (A) "would make subsections (B) through (F) virtually superfluous." Opinion at 1239-1240.
In my view, these grounds are unconvincing. Both as a matter of statutory construction and common sense, ability to care is and must be relevant to an inquiry under subsection (A).
Alaska Statute 47.10.010(a)(2) contains six subsections which state alternative grounds for finding a child in need of aid. The grounds and subsections are independent, but are not necessarily discrete because more than one ground may apply in a given case.
It is first essential to recognize the evil at which subsection (A) is aimed. Subsection (A) is directed at two basic problems: (1) conduct of the child which deprives the child of available care ("the child being habitually absent from home," i.e., running away, or "refusing to accept available care"); and (2) want of a person (parent, or guardian, custodian, or relative) to provide care to the child ("the child ... having no parent . .. caring or willing to provide care"). Subsection (A) focuses on the two situations in which the child is deprived of care, the first when the child's acts or omissions prevent delivery of care, and the second when there is no one to deliver care. Subsection (A) thus addresses two different sources of a single fundamental evil: a failure of care for the child. If the child does not receive the necessary care, there has been a failure of care.
Comparison of subsection (A) with subsections (B) through (F) confirms the legislative scheme. Although those other subsections address what might initially seem to be relatively more specific and harmful hazards, the legislature put subsection (A) on an equal footing with the other subsections as a basis for adjudicating a child in need of aid. We must assume that the legislature considered hazards posed by a failure of care to be equivalent to those addressed in subsections (B) through (F). It is not for us to make explicit or implicit value judgments about whether a child deprived of care is entitled to less protection than one placed in imminent danger. The child deprived of care may ultimately suffer as much as the child who is a victim of more violent but less insidious conditions, and the arrangement of AS 47.10.010(a)(2) suggests that the legislature recognized this.
Subsection (A) does not require that the child be in grave danger. Indeed, under some circumstances a runaway child might fare better outside the home than in it. The subsection specifies physical abandonment as an example of a deprivation of care sufficient to invoke the subsection, but does not require conduct that dramatic for CINA jurisdiction to be appropriate. The physical abandonment example does suggest, however, that the legislature was concerned about relatively serious failures of care, in which the ostensible caregiver has functionally, if not physically, abandoned the child.
*1244 Subsection (A) thus contemplates two alternative grounds for finding the child to be in need of aid, one attributable to the child who runs away or refuses care, and the other attributable to persons who should or could care for the child. Common to both grounds is the notion that there will be a fundamental deprivation of care. This notion is important. Notwithstanding past failures, CINA status under subsection (A) is not warranted unless the child will be fundamentally deprived of care in the future. A CINA adjudication therefore requires the court to predict as best it can whether the present failure of care is resolved, and whether the child will henceforth get the necessary care.
It necessarily follows that subsection (A) deals with the delivery and the deprivation of care. That conclusion is irreconcilable with this court's reading of subsection (A), because this court appears to think that willingness to provide care can substitute for delivery of care. Opinion at 1239. To the contrary, subsection (A) is concerned with performance, not intentions.
The legislature provided a definition of "care" and "caring" to be applied in disputes under AS 47.10.010(a)(2)(A): "`care' or `caring' under AS 47.10.010(a)(2)(A) ... means to provide for the physical, emotional, mental, and social needs of the child." AS 47.10.990(1). We must apply this definition here. The court's contention  that AS 47.10.010(a)(2)(A) merely requires that an eligible person be willing to care for the child regardless of ability to provide care successfully  ignores both the express words of this definition, and its implications.
The court reads the clause "willing to provide care" as though willingness is independent of a performance standard, and simply turns on the willingness  the good intentions  of a would-be provider. That reading of the statute is conceptually erroneous. When the definition found in § 990(1) is inserted into AS 47.10.010(a)(2)(A), CINA jurisdiction exists when there is no eligible person who is presently providing for the child's needs and there is no other eligible person willing to provide for those needs. The phrases "caring" and "willing to provide care" are not alternatives; instead, they express two conditions which must both exist for CINA jurisdiction. Jurisdiction exists if the child's needs (1) are not currently being met (no one is now "caring" for the child), and (2) will not be met by other eligible persons (no one is "willing to provide care" in the future). Subsection (A) does not make good intentions a substitute for good care. Mere "willingness" is not an acceptable alternative to "caring," and the legislature did not intend it to be. A would-be provider who is unable to provide care does not have the willingness subsection (A) contemplates. The overriding concern expressed in AS 47.10.010(a)(2), including subsection (A), is the child's receipt of care. Thus, the "willingness" which the statute demands must be accompanied with the ability to provide care successfully.
The court interprets the clause "caring or willing to provide care" as though "caring" and "willing" are parallel alternatives. That interpretation ignores the evil addressed by subsection (A), the deprivation of care. It also overlooks the legislature's scheme, that a child is in need of aid if there is a present failure of care, and if care will not be provided by an eligible person in the future. The word "willing" in the clause "willing to provide care" must be understood in the context of CINA disputes. Such cases arise because the present custodian has failed to deliver the necessary care; nonetheless, the child is not in need of aid if some other eligible person stands ready to deliver that care in the future. The element of "willingness" simply conveys the other person's commitment to deliver care.
A mere expression of good intent is insufficient if the care will not in fact be provided. The person who is well-meaning, but hopelessly incapable, may be "willing" in the broadest sense, but is not "willing to provide care" in the sense required by subsection (A). The clause "willing to provide care" is intended to guarantee that care will be delivered in the future, and the inability of the prospective *1245 caregiver is just as relevant to the adjudication as the present ability of the current custodian is.
The structure and purpose of AS 47.10.010(a)(2) confirm this reading. In each of its subsections, AS 47.10.010(a)(2) invites inquiry into whether a child's "physical, emotional, mental, and social needs" are actually being met. These subsections contain objective performance standards[2] because good intentions alone do not ensure that a child's "physical, emotional, mental, and social needs" are satisfied. Thus the structure and purpose of AS 47.10.010(a)(2) preclude a conclusion that the legislature intended to withhold CINA jurisdiction when a parent has good intentions, but is responsible for conditions that endanger a child.
Furthermore, the legislature could not have intended that a person who is unable to care is "willing to provide care." Consider a parent whose fundamental lack of mental capacity results in an inability to meet the child's normal needs, and thus in a lack of "caring" as that word is used in subsection (A). If the court were correct, that parent could defeat CINA jurisdiction simply by professing that she/he is "willing" to provide care despite her/his demonstrated inability to do so. The child would then return to the parent, whose inability would again be demonstrated, again placing the child in jeopardy. Assuming the conditions created by the parent then put the child in substantial danger, DHSS would again try to intervene to protect the child. Either the superior court would find CINA jurisdiction to protect the child (possibly under subsection (A) on an abandonment theory or under subsection (C) if the harm were "imminent"), or the willing parent could again defeat jurisdiction at continuing risk to the child. The legislature could not have intended the latter result, and the former is an exercise in judicial circuity that needlessly exposes the child to harm.
Likewise, consider the example of a relative who professes a willingness to care for the child. According to this court, the superior court could not assert jurisdiction over the child, regardless of the relative's proven inability to provide care in the future. However, if the relative took custody and subsequently failed to "provide for the physical, emotional, mental, and social needs of the child," the relative would not be "caring" for the child under subsection (A). The superior court could then assert CINA jurisdiction (unless, of course, some other well-meaning but incapable relative expressed a willingness to provide care). It makes more sense to allow the court to consider whether the parent or relative is able to provide care before he or she obtains custody on the sole basis of professed willingness to provide care. It makes no sense to deny CINA jurisdiction where an eligible adult is willing  but indisputably unable  to provide care if the court will have to take jurisdiction once the well-meaning but incapable custodian inevitably creates conditions which jeopardize the child.[3]
The court should consequently hold that a trial court may consider relevant the would-be custodian's ability to care in determining whether a child is in need of aid under AS 47.10.010(a)(2)(A).
The court first reasons that this interpretation of subsection (A) would permit CINA adjudications based on parenting deficiencies "much less severe" than those covered under subsections (B) through (F). Opinion at 1239, 1240-1241.
This reason is unpersuasive. It erroneously assumes that, in the eyes of the legislature, *1246 the evil addressed in subsection (A) is inherently less severe than those evils addressed in subsections (B) through (F). The legislature made subsection (A) an independent basis for asserting CINA jurisdiction. It did not require that the child be in imminent danger for adjudication under subsection (A). This court fails to recognize that the legislature considered the failure to provide care for the child to be an evil just as deserving of intervention as those hazards addressed in subsections (B) through (F). The court thus errs in assuming the legislature did not intend the ostensibly "much less severe" deficiency of failure of care to be the basis for intervention.[4]
The second reason announced by the court is also unpersuasive. The court finds inability to care to be irrelevant to subsection (A) because subsections (B) through (F) contain specific standards for CINA jurisdiction based on inability to care. Opinion at 1240, 1241. That subsections (B) through (F) arguably set "clear, specific standards" for CINA adjudications does not mean that the court can ignore subsection (A). I do not see the dichotomy the court perceives between subsection (A) and subsections (B) through (F). Just because acts or omissions of parents or caregivers may fall within subsections (B) through (F) does not mean that inability to care is irrelevant to subsection (A). Further, I do not agree that subsection (A) is without standards. "Care" and "caring" are defined by AS 47.10.990(1), and the concepts addressed in subsection (A) are readily understood.
The third reason, the danger subsection (A) would make the other subsections "virtually superfluous," is easily avoided by recognizing that subsection (A) is directed at failure of care. Subsection (A) encompasses that specific evil, as distinguished from the acute hazards addressed by the other subsections. The situations addressed in subsection (A) are not necessarily the same as those addressed in subsections (B) through (F). More than one subsection may apply in any given case, but that does not mean the other subsections are rendered superfluous or that the legislature intended the reading this court now imposes on the statute.
Any possible superfluity is avoided by limiting subsection (A) in a manner consistent with its terms. The legislature could not have expected that a mere best interests analysis would establish CINA status under subsection (A). Further, the specific circumstances noted in subsection (A) (i.e., running away, physical abandonment) illustrate the magnitude of the sort of failure of care the legislature intended to address. Further, the reference to "available care" implies that the legislature did not intend to require perfect care. This court previously gave content to subsection (A) and limited its application by appropriately rejecting the equivalent of a best interest analysis during a CINA adjudication. F.T. v. State, 862 P.2d 857 (Alaska 1993). In that case, the State argued that a father could not have been "willing to provide care" because he was unable to meet his child's special needs due to the child's severely emotionally disturbed condition. Id. at 860-61. I agree with that result. In those circumstances, no parent could be expected to "cure" the child or meet other than the child's most basic needs. The holding in F.T. appropriately limits CINA adjudications under *1247 subsection (A). This limitation prevents subsection (A) from swallowing up the other subsections.
Unfortunately, in my view, the court in F.T. then proceeded to expand on this narrow and appropriate holding. It rejected an argument that inability to care could support a finding that a child is in need of aid under AS 47.10.010(a)(2)(A). It stated, "AS 47.10.010(a)(2)(A) would support a CINA adjudication only if [the child] had no parent, guardian, custodian, or relative caring or willing to provide care. Specifically, the parties' [sic] dispute whether [the father] was willing to provide care." Id. at 861. DHSS argued "that [the father] could not have been willing to provide care because he was unable to meet [the child's] needs." Id. This court rejected that argument and DHSS's "conclusion that if a child has needs a parent cannot meet, then the parent cannot be `willing to provide care' for that child." Id. The court stated that
the State's conflation of willingness to care and ability to satisfy needs leads to absurd conclusions. By the State's logic, the parent of any child with an incurable disease is not willing to care for that child, since by definition the parent will not be able to meet the child's medical need for a cure.
Id. The F.T. opinion reasoned that inability to care was insufficient to support a finding that a child is in need of aid under subsection (A). The question actually presented there was, in my view, substantially narrower than this court's broad language would suggest.
The actual holding in F.T. is nonetheless correct, and instructive. The ability of a parent or relative to provide care should be compared to a normal level of parental fitness. For example, if no person could successfully provide the care required to cure an incurably-ill child, general parental fitness would nonetheless be sufficient to defeat jurisdiction under AS 47.10.010(a)(2)(A). For jurisdiction to be found under subsection (A), the inability to care would have to lead to a harm or a threat of harm of a gravity comparable to that presented by the circumstances specified in other parts of AS 47.10.010(a)(2).[5]See Rosenberg v. Smidt, 727 P.2d 778, 786 n. 18 (Alaska 1986) (applying the principle of statutory construction that "the meaning of doubtful words may be determined by reference to their association with other associated words and phrases").[6] That comparison, of course, requires recognition that a failure of care under subsection (A) could be sufficiently grave in the eyes of the legislature to justify intervention as a matter of social policy.
According to the court, the State's reading of subsection (A) in this case would permit *1248 the State to assume custody over "any child who had needs the child's parents could not meet." Opinion at 1241. As noted above, I agree that such a reading would be too broad. That does not mean, however, that this court's reading is correct.
The court argues that the better way to interpret subsection (A) is "in accordance with its plain intent...." Opinion at 1241. I agree. I read subsection (A), however, to express a different intent.
Because the court misinterprets subsection (A), it erroneously concludes that inability is irrelevant to a CINA adjudication under that subsection. To repeat, the inability to care is relevant to both conditions which have to be met under subsection (A) in a case like this. There must first be no parent or other eligible caregiver who is in fact "caring" at present for the child, i.e., there must be a present failure of care. Second, there must be no other parent or caregiver "willing to provide care" if the child's custody were to be changed to some other eligible caregiver. The court erroneously reads "caring" and "willing to provide care" to be two separate alternatives. It reads willingness as a substitute for ability. Its reading fails to distinguish between the status quo and the future. Assuming the current caregiver is presently failing to provide the necessary care, a CINA adjudication is nonetheless inappropriate if some other eligible caregiver is able to provide care in the future. Willingness alone is no substitute for an ability to perform. The court looks at willingness in isolation, and fails to give appropriate weight to the clause "to provide care."
For these reasons, this court should not overrule its prior opinions in which it found inability to provide care to be relevant to a subsection (A) inquiry. See A.M. v. State, 891 P.2d 815, 824 (Alaska 1995); In re T.W.R., 887 P.2d 941, 945 (Alaska 1994); In re J.L.F., 828 P.2d 166, 170 (Alaska 1992). I would consequently disavow the language in F.T., 862 P.2d at 860, by which the court rejected an argument that inability to care could support a finding that a child was CINA under subsection (A). I would not overrule the explicit holding in F.T.
In the case now before us, the record does not warrant a finding that S.A. and D.A. are CINA under AS 47.10.010(a)(2)(A), because the facts do not justify a conclusion that N.A. was, at the time of the trial, unable or unwilling to provide the kind of care contemplated under subsection (A). I consequently agree that the termination of N.A.'s parental rights should be reversed.
NOTES
[1] The record does not contain evidence that N.A.'s yelling amounts to severe emotional abuse of the sort that could support a CINA adjudication under AS 47.10.010(a)(2)(B), which permits a CINA finding as a result of

the child being in need of medical treatment to cure, alleviate, or prevent substantial physical harm, or in need of treatment for mental harm as evidenced by failure to thrive, severe anxiety, depression, withdrawal, or untoward aggressive behavior or hostility toward others, and the child's parent, guardian, or custodian has knowingly failed to provide the treatment.
(Emphasis added.)
[2] Three of the State's witnesses testified about possible safety risks to the boys with N.A. DHSS social worker Paula Bettano Everts stated that she had safety concerns for the boys, as "the boys are very easy victims because they can't talk," and "the boys' behavior is very unpredictable." Everts expounded that the boys run around a lot and could encounter a physical danger in their environment because N.A. is unable to focus her attention on them all of the time.

Connie Kind, a family consultant who worked with N.A. on parenting skills, stated that "there ... could be some safety issues" if S.A. and D.A. were placed with N.A. Kind explained that at times she feared that the boys would enter places that were not safe. But Kind also stated that she never saw the boys in "any immediate danger" while under N.A.'s care, and acknowledged that she never saw N.A. "expose her sons to anything that would put them in physical danger while she was with them." Kind elaborated that her own awareness of potential safety risks was greater than N.A.'s and that Kind "was quicker to react than [N.A.] was sometimes to [potential] dangers."
Lillian Coleman, a counselor who worked with N.A., testified that S.A. and D.A. require constant supervision and at times engage in behavior that raises concerns about their safety. Coleman also testified, however, that N.A. removed the boys from danger when they engaged in risky behavior, and that she never saw N.A. do anything to endanger S.A. and D.A. When asked whether the boys would be at risk if placed in N.A.'s care, Coleman responded, "I don't know."
In addition, Carolyn Cyr, a therapist at Dena A. Coy, testified that N.A. never did anything to jeopardize the safety of her sons during visits. Ruth Evans, one of N.A.'s counselors, stated that the boys would be safe with N.A. N.A. herself testified that supervising S.A. and D.A. required preventing them from "getting into stuff ... like the medicine cabinet, and running out to the street, and ... play[ing] with anything that's dangerous, like tools, knives."
[3] N.A.'s past alcohol abuse also cannot support the superior court's finding that S.A. and D.A. are CINA under subsection (C) as a result of conduct by N.A. which is likely to continue. N.A. no longer uses alcohol. Cf. In re R.K., 851 P.2d 62, 66-67 (Alaska 1993) (reversing superior court's termination of parental rights where father had once neglected his children, apparently because of alcohol or drug use, but claimed to no longer be using alcohol or drugs; explaining that father's substance use could be monitored).
[4] The superior court stated in its written decision:

The evidence demonstrates clearly and convincingly, however, that [N.A.] is not able to understand and meet the children's significant needs for structure, stability, consistency and nurturing.
The court finds by clear and convincing evidence that the parental conduct which caused the children named above to be children in need of aid is likely to continue if [N.A.]'s parental rights are not terminated. [N.A.] has never demonstrated an understanding of or ability to meet her children's needs.
[5] If a parent intends to place a child with a caregiver who would harm the child as proscribed in subsections (B) through (F), the child can be declared CINA under the appropriate provision(s) of subsections (B) through (F).
[6] For example, in this case, while the superior court did declare S.A. and D.A. CINA under subsections (A) and (C), its findings appear to fit in mainly under the State's interpretation of subsection (A). And we are aware of at least two other pending termination of parental rights appeals where the superior court adjudicated children CINA only under subsection (A), without considering other subsections, even though the records in those cases arguably could have supported CINA adjudications under subsections (C) or (F).
[7] The results we reached in A.M., T.W.R., and J.L.F. would not change under our holding in this case. In A.M., the superior court's termination of parental rights was based solely on a finding that the father had abandoned his children. 891 P.2d at 820. We ruled that the abandonment finding was clearly erroneous. Id. at 824. We remanded the case for consideration of whether the father was able to care for the children. Id. at 824-25. We noted:

The superior court specifically found, beyond a reasonable doubt, that A.M.'s daughter was likely to suffer sexual abuse if placed in his custody; that both children were likely to suffer physical abuse resulting from A.M.'s domestic violence; and that both were likely to suffer physical deprivation due to A.M.'s inability to meet their needs on a consistent, ongoing basis.
Id. at 825. These findings would support CINA adjudications under subsections (D), (C), and (F), respectively.
In T.W.R., we affirmed the superior court's termination of parental rights and finding that the mother was unable to care for her children. 887 P.2d at 945. In that case, the record showed and the superior court specifically found that the children were CINA under subsection (B) as a result of the mother's failure to provide them with needed medical attention. Id. at 946.
In J.L.F., we refused to uphold a termination of parental rights where the superior court relied only on subsection (A). 828 P.2d at 169-70. We noted that the superior court's findings "fit well under subsection (2)(C)." Id. at 170. We remanded for determination of whether parental rights could be terminated under subsection (C). Id.
[8] Our resolution of the AS 47.10.010(a)(2) issues makes it unnecessary to consider the other arguments made on appeal by N.A., who is an Alaska Native. We doubt, however, that the evidence presented by the State in this case satisfied the requirements of Alaska Child in Need of Aid Rule 18(c)(2), which prohibits termination of the parental rights of a Native parent unless the evidence shows beyond a reasonable doubt that custody of the child by the Native parent will likely cause the child to suffer serious emotional or physical damage. See also 25 U.S.C. § 1912(f) (1988); K.N. v. State, 856 P.2d 468, 474 (Alaska 1993).
[1] AS 47.10.010 provides in pertinent part:

(a) Proceedings relating to a minor under 18 years of age residing or found in the state are governed by this chapter, except as otherwise provided in this chapter, when the court finds the minor
....
(2) to be a child in need of aid as a result of
(A) the child being habitually absent from home or refusing to accept available care, or having no parent, guardian, custodian, or relative caring or willing to provide care, including physical abandonment by
(i) both parents,
(ii) the surviving parent, or
(iii) one parent if the other parent's rights and responsibilities have been terminated under AS 25.23.180(c) or AS 47.10.080 or voluntarily relinquished.
[2] The other jurisdictional bases contemplated by subsection (A) and in subsections (B) through (F) concern the quality of care the child actually receives or is likely to receive.
[3] The specification of "physical abandonment" in subsection (A) does not suggest it is the only circumstance in which there is no eligible person caring or willing to provide care for the child. Subsection (A) uses the word "including" to introduce physical abandonment as one such circumstance. According to Webster's Third New International Dictionary 1142 (1969), "include" means "to place, list, or rate as a part or component of a whole or of a larger group, class, or aggregate."
[4] Although the hazards specifically addressed in subsections (B) through (F) might at first glance appear substantially more severe, and therefore more deserving of legislative attention and DFYS intervention than the failure of care addressed in subsection (A), the court's assumption that this is so puts more reliance on labels than on the words of the statute. It also reflects a policy decision which appears to have been made by the legislature, and which is beyond our province to alter. Further, I am not convinced that a failure of care for children is any less damaging to their long-term well-being than some of the hazards which are the subject of subsections (B) through (F). See generally Oliver C.S. Tzeng & Jamia Jacobsen, Sourcebook for Child Abuse and Neglect 53-77 (1988); Henry B. Biller & Richard S. Solomon, Child Maltreatment and Paternal Deprivation 14-20 (1986); Harold P. Martin, Abused Children  What Happens Eventually, in Child Abuse: A Community Concern 154-69 (Kim Oates ed., 1984); Vincent J. Fontana & Douglas J. Besharov, The Maltreated Child (1979). Therefore, not only is the court potentially making value judgments reserved for the legislature, it may well be reaching erroneous conclusions.
[5] Subsection (A) itself specifies three different circumstances in which such a harm is present or threatened: the child is habitually absent from the home, the child refuses to accept available care, and the child is physically abandoned. AS 47.10.010(a)(2)(A). As discussed above, "physical abandonment" is not the exclusive basis for determining under subsection (A) that there is no eligible person "caring or willing to provide care" to the child. See supra, note 8. For example, a parent who remains in the child's immediate vicinity may not have physically abandoned the child, but may have through inability or disinterest so ignored the child's needs as to have constructively abandoned the child.

The other circumstances specified by AS 47.10.010(a)(2) in which such harm is present or threatened are: the child's not having received necessary medical treatment because of a parent's knowing failure to provide it (subsection (B)); the child's having suffered, or facing an imminent and substantial risk of suffering, substantial physical harm as a result of a parent's acts or omission (subsection (C)); the child's having been, or being in imminent and substantial danger of being, sexually abused by a parent or as a result of parental neglect or facilitation of the abuse (subsection (D)); the child's committing delinquent acts as a result of parental pressure, guidance, or influence (subsection (E)); and the child's having suffered substantial physical abuse or neglect as a result of conditions created by the parent (subsection (F)).
[6] Requiring that the inability to care present a harm or threat of harm as serious as those reflected in the other circumstances enumerated in the subsections of AS 47.10.010(a)(2) ensures that those subsections are not rendered superfluous. See Journey v. State, 895 P.2d 955, 959 n. 10 (Alaska 1995) (explaining that "as a general rule, statute should be construed so that effect is given to all its provisions and no part is inoperative or superfluous, void or insignificant") (citation omitted).