**In the Matter of R.K., DOB: 1/19/85, E.K., DOB: 4/28/86, Minors Under the Age of Eighteen (18) Years.**

**No. S–4894.**

Supreme Court of Alaska.

April 30, 1993.

Rehearing Denied May 28, 1993.

Thomas E. Fenton, Fairbanks, for appellant Richard Hudson.

Scott Davis, Asst. Atty. Gen., Fairbanks, Charles E. Cole, Atty. Gen., Juneau, for appellee State of Alaska.

Before RABINOWITZ, C.J., and BURKE, MATTHEWS and MOORE, JJ.

## OPINION

MATTHEWS, Justice.

In this case Richard Hudson challenges the superior court's order terminating his parental rights with respect to R.K. and E.K. We reverse the superior court's ruling.

### FACTUAL AND PROCEDURAL BACKGROUND

R.K. and E.K. were found to be children in need of aid under AS 47.10.010(a)(2) on January 9, 1989, by stipulation between the Division of Family and Youth Services (DFYS) and their mother.[1] In the stipula-

---

1. The facts bringing the children to the attention of the department were alleged as follows:

At 8:15pm on October 14, 1988, the emergency room doctor at Fairbanks Memorial Hospital reported to the Division of Family and Youth Services (DFYS) that an unknown female brought [R.K.] and [E.K.] to the emergency room. The woman said the children had drunk one-half bottle of Contac cold medicine while in the care of a babysitter who has run away. The doctor said the children both had ingested toxic amounts of tylenol and

tion the mother "admits that the children ... are children in need of aid under AS 47.10.010(a)(2)(A) and (B) on the basis of the facts set forth in the petition [of October 15, 1988] in this case."[2] The initial, October 15th, petition indicated that the mother's location was unknown and that the father "may be Richard L. Hudson."

At the first hearing on the petition held before a magistrate on October 15, 1988, Richard Hudson appeared and testified that the children had been left in the custody of a babysitter whom he had found at the Savoy Bar because he was unable to find any of the children's usual babysitters. Hudson was asked by the judge whether he was the father and he gave the following equivocal testimony:

MR. HUDSON: Well, they call me Daddy. I've been there since they were born, if that's....

THE COURT: Well....

MR. HUDSON: ... tell you now, I'm not their father.

THE COURT: You're not the father.

MR. HUDSON: No. But, I mean, I'm— it's like I've been around lot longer than family.

THE COURT: All right.

MR. HUDSON: (Indiscernible) family (indiscernible) normally to 'm. I mean, they are my children. I mean, I'm all they've got (indiscernible) parent (indiscernible).[3]

At the next hearing, held on October 17, 1988, only the guardian ad litem, counsel for the state, and personnel from DFYS were present. The state's counsel represented that: "Mr. Richard Hudson appeared at the hearing over the weekend, acknowledged that he was not the father of the children. So, the petition probably should be amended to reflect that the children's father is unknown at this time." The children were placed in a foster home near Fairbanks.

At a pretrial conference held on January 5, 1989, where again only the state's attorney, the guardian ad litem, and DFYS personnel were present, the trial judge stated that Richard Hudson had been before her that morning on a criminal case in which he was in custody. At that time Hudson represented that he was not the father of the children. The trial judge therefore did not arrange to have Hudson brought before the court in the children's matter. At the hearing on January 9, where the mother

---

pseudoephedrine. The doctor also reported that both children have a more than average number of scratches and abrasions and [E.K.] has pneumonia. When Mr. Hudson, the father, arrived at the hospital he became angry at the doctor and tried to remove the children from the hospital. The doctor had to call hospital security to intervene. The father then left the hospital stating he must get back to work. The father again came to the hospital at 3:00 am on October 15, 1988 and tried to remove the children. The mother's whereabouts are unknown. There is an imminent and substantial risk that the minors would suffer harm without the intervention of DFYS.
Petition for Temporary Custody, October 15, 1988.

2. AS 47.10.010(a)(2)(A) and (B) provide:
(a) Proceedings relating to a minor under 18 years of age residing or found in the state are governed by this chapter, except as otherwise provided in this chapter, when the court finds the minor
....
(2) to be a child in need of aid as a result of
(A) the child being habitually absent from home or refusing to accept available care, or having no parent, guardian, custodian, or rel-ative caring or willing to provide care, including physical abandonment by
(i) both parents,
(ii) the surviving parent, or
(iii) one parent if the other parent's rights and responsibilities have been terminated under AS 25.23.180(c) or AS 47.10.080 or voluntarily relinquished;
(B) the child being in need of medical treatment to cure, alleviate, or prevent substantial physical harm, or in need of treatment for mental harm as evidenced by failure to thrive, severe anxiety, depression, withdrawal, or untoward aggressive behavior or hostility toward others, and the child's parent, guardian, or custodian has knowingly failed to provide the treatment[.]

3. Hudson explains his testimony by indicating that he believed he needed to be listed on the children's birth certificates as the father in order legally to be considered their father. He maintains that as DFYS informed him that he was not listed on the children's birth certificates as the father, he therefore believed he could not state to the judge that he was the legal father.

stipulated to state custody for two years, no discussion of the paternity of the children took place.

The next event of significance was a call from Hudson to DFYS case worker Nicki McCabe on June 21, 1989. Hudson sought visitation with the children, stating first that he was their father and second that even if he was not, he had assumed the role of their father. McCabe explained to Hudson that he would have to prove his paternity in order to see the children. She stated that Hudson, the children and the mother would all have to have their blood tested. Hudson contacted the mother, who agreed to have her blood tested in July of 1989. However, she did not show up to have blood taken.

Hudson phoned McCabe on July 26, 1989, and explained that he had attempted to have the mother give blood, but that she had been uncooperative. Nevertheless, in August of 1989 the children were placed in a permanent foster home in Anchorage.[4] After several attempts, McCabe finally contacted the mother on September 14, 1989. The mother stated that Hudson was not the father of the children. On October 10, 1989, McCabe called Hudson to determine if any progress had been made concerning the blood tests. Hudson explained that he had not seen the mother for a few months.[5]

On January 18, 1990, the state petitioned for termination of parental rights of the mother[6] and of the unknown father pursuant to AS 47.10.080(c)(3). The statute provides:

(c) If the court finds that the minor is a child in need of aid, it shall

. . . .

(3) by order, upon a showing in the adjudication by clear and convincing evidence that there is a child in need of aid under AS 47.10.010(a)(2) as a result of parental conduct and upon a showing ... by clear and convincing evidence that the parental conduct is likely to continue to exist if there is no termination of parental rights, terminate parental rights and responsibilities of one or both parents and commit the child to the department....

The court appointed counsel to represent the unknown father(s). Counsel contacted Hudson and then sought court orders requiring the mother to give blood in order to determine paternity. Although the court ordered the mother to have her blood taken for testing purposes on February 23, 1990 and March 27, 1990, and issued bench warrants to enforce the orders on May 7, 1990 and June 5, 1990, the mother was not apprehended until late November of 1990. At that time, testing took place and by December of 1990 it was clear that Hudson was the biological father of R.K. As of January 28, 1991, the test results confirmed that Richard Hudson was also the father of E.K.

A custody review hearing was held on March 6, 1991, before Judge Richard Savell. Hudson was present and testified at the hearing, although he was then incarcerated at the Palmer Correctional Facility.[7]

**4.** McCabe indicates in the Annual Review of Child in Need of Aid Report filed with the court on January 8, 1990, that Hudson "has attempted to prove paternity by trying to arrange blood testing; however, [the mother] has refused ultimately to cooperate."

**5.** McCabe testified that the mother "wasn't easy to find." The only way to contact her was to leave a message for her at the Savoy Bar. Sometimes the mother would respond and sometimes she would not.

**6.** The mother's rights were terminated on May 15, 1990.

**7.** The record reveals that Hudson was arrested for three separate incidents of cocaine possession in October, November and December of

1988. He was arrested for a fourth possession charge in August of 1989. He was incarcerated beginning in December of 1988 until February of 1989. At that point he entered a private drug rehabilitation program where, as he described it, he was "locked down" for 127 days. After his release from confined status in the program, he participated in the program for another ten months. This entailed attending meetings once a week and having random urinalysis about twice a week. He states that he successfully completed the program and had only one urinalysis which showed the presence of cocaine which, he claims, was an error as a blood test taken at the same time confirmed that he had not ingested cocaine. Hudson worked at mining jobs during the summer of 1989 and the summer of 1990. He began serving a three-year

At the conclusion of the hearing, Judge Savell ordered that state custody of the children be extended for a period not to exceed two years. The court found that Hudson was responsible for the delay in establishing paternity for the children, that he had not asserted any genuine interest in the children after October 15, 1988, and that his conduct leading up "to the emergency custody of these children on October 14, 1988, constitute[s] clear and convincing evidence that these children continue to be children in need of aid." The court also found that it could be seriously harmful to the children if they were removed from their current placement and that it would be contrary to their welfare to be placed with Hudson or his relatives.

In October of 1991, the court heard the state's petition to terminate Hudson's parental rights. Following the hearing the court ordered Hudson's rights terminated. The court found that Hudson's neglect in October of 1988 resulted in the children being children in need of aid, and that such neglect would likely continue if there were no termination of his parental rights. Specifically, the court found:

(a) The children's condition at the time they were taken into emergency custody in October 1988 is directly attributable to and the result of the neglect the children suffered while in Mr. Hudson's care. The children were bruised, cut, had head lice, [E.K.] had pneumonia, both children had traces of cocaine and amphetamines in their system, and both children had taken toxic amounts of cold medicine. Mr. Hudson had found an inappropriate baby-sitter in the Savoy Bar to watch the children just prior to the time that they were taken into emergency custody. Both parents were caught in the whirlwind of substance abuse, including alcohol and cocaine abuse, and this significantly interfered with their ability to meet the needs of and care for their children. There was neither reliable nor consistent childcare, nor appropriate attention to the children's health. Mr.

presumptive sentence on the drug charges in November of 1990. He was released from cus-

Hudson testified that during this time period he was either working twelve to fourteen hours a day or on drug consuming binges.

(b) The information available at the time the children were taken into the emergency custody, and subsequently was that the children were in Mr. Hudson's care, therefore their condition was directly attributable to his neglect and total lack of insight regarding the children's needs.

Concerning the critical predictive finding of continuing neglect, the court found that Hudson continued to demonstrate "very little insight into his psychological and drug related difficulties" and lacked "insight into the needs of his children." The court found that Hudson has a poor prognosis for sobriety in the future.

## DISCUSSION

In order to terminate parental rights under AS 47.10.080(c)(3), the "court must find by clear and convincing evidence (1) that there is a child in need of aid under AS 47.10.010(a)(2) as a result of parental conduct, and (2) that the parental conduct is likely to continue." *R.C. v. State*, 760 P.2d 501, 504 (Alaska 1988) (citing *E.J.S. v. State*, 754 P.2d 749, 750 (Alaska 1988); *K.T.E. v. State*, 689 P.2d 472, 475 (Alaska 1984)).

On appeal Hudson argues that the superior court erred in finding that R.K. and E.K. were children in need of aid due to his conduct and that such conduct would likely continue. More specifically, Hudson contends that: (1) he was not responsible for the condition of the children when they were taken into emergency custody on October 14, 1988, as the children were in the custody of the mother at that time; and (2) that even if he was the custodian of the children as of October 14, 1988, the trial court's finding that his conduct will likely continue is clearly erroneous.

tody on January 25, 1992.

Both of Hudson's challenges are to factual findings made by the trial court. This court will reverse factual findings only if we find them clearly erroneous. *In Re J.L.F. and K.W.F.*, 828 P.2d 166, 170 n. 12 (Alaska 1992). Findings are clearly erroneous when the reviewing court is left with a definite and firm conviction after reviewing the entire record that a mistake has been made. *Id.* (quoting *Parker v. Northern Mixing Co.*, 756 P.2d 881, 891 n. 23 (Alaska 1988)).

With respect to Hudson's first point concerning whether he or the mother was the caretaker in fact of the children on October 14, 1988, we are unable to say that the trial court's finding was clearly erroneous. Although Hudson testified that the children were in the mother's care on October 14, his statement before the magistrate on the following day is to the contrary. He explained this inconsistency as an effort on his part to protect the mother, but the trial court was not required to accept this explanation.

On the second point, however, it is our view that the trial court's predictive finding was clearly erroneous. Sufficient evidence does not exist to support the conclusion that the parental conduct which resulted in the determination that the children were in need of aid was likely to continue. Hudson argues that "[h]e has never been given a chance to demonstrate his conduct after the night in question because the state would not deal with him because he had not established his paternity and because for most of the time he has been in prison." In our view there is merit to this position. DFYS employees informed Hudson that he could not visit the children until he had established that he was their father. After McCabe informed Hudson that blood tests from the mother were required, a period of approximately eighteen months elapsed before paternity of both children was established. The trial court found that Hudson was responsible for this delay. These findings are contrary to the record before us. The delay in proving paternity clearly resulted from the mother's refusal, even under court order, to provide blood for testing purposes.

The critical role that the delay played in the state's decision to terminate Hudson's parental status is illustrated by the testimony of DFYS case worker McCabe. She testified that the main reason the state decided to seek termination of Hudson's parental rights was "because Richard Hudson did not come forth for the first eight months [the children] were in custody, and then it ... took him two and a half years to prove his paternity." Similarly, McCabe testified that if Hudson had established his paternity in June of 1989 she "would have been extremely pleased to look at potential ... placements [with relatives] for these children." [8]

In essence the state's case is based on one episode of neglect on the part of Hudson in October of 1988. While Hudson may have been at fault for leaving the children with an unqualified babysitter and for not realizing that the children needed some medical attention, these acts do not signify a continuing pattern of gross disregard for the welfare of R.K. and E.K. While at the hospital on October 14 and 15, 1988, the children were described by the attending physician as healthy, well nourished and giving no appearance of having been physically abused.[9]

The evidence of Hudson's neglect is too limited both as to its extent and duration to sustain a prediction by clear and convincing evidence that he is likely to continue to be unable to provide appropriate parental care for the children. Hudson claims no longer to be a user of illegal drugs or alcohol.

---

8. McCabe was also asked: "And had he established paternity at that time, [in June of 89] your testimony is that you would have considered relatives of his for placement." Answer: "Definitely."

9. The report that traces of cocaine were found in the children's systems is a disturbing but undeveloped point. No evidence is presented as to the accuracy of the test, whether the cold medicines the children drank might explain the test results, or how the children might have gotten cocaine. No one suggests, however, that Hudson gave cocaine to the children.

The truth of this claim can be monitored on an ongoing basis as a condition of Hudson exercising such visitation or custody rights as he may eventually gain.

The order of the superior court terminating Hudson's parental rights is RE-VERSED.

COMPTON, J., not participating.