In the Matter of J.W., DOB: 1/2/85, W.W., DOB: 12/21/88, Minors under the Age of Eighteen (18) Years.

J.P.W., Appellant,

v.

STATE of Alaska, Appellee.

No. S–7116.

Supreme Court of Alaska.

July 19, 1996.

Philip M. Pallenberg, Assistant Public Defender, Juneau, and John B. Salemi, Public Defender, Anchorage, for Appellant.

Jan A. Rutherdale, Assistant Attorney General, and Bruce M. Botelho, Attorney General, Juneau, for Appellee.

Before COMPTON, C.J., and RABINOWITZ, MATTHEWS, EASTAUGH and FABE, JJ.

## OPINION

COMPTON, Chief Justice.

## I. INTRODUCTION

The superior court determined that J.W. and W.W. were children in need of aid as a result of their having suffered substantial neglect because of conditions created by their parents. It terminated the rights of both parents to the children. J.P.W., the children's natural father, appeals, contending that the superior court erred in finding that (1) the children were children in need of aid on the basis of their father's conduct, (2) this parental conduct was likely to continue, and (3) the State had made active remedial efforts. We affirm.

## II. FACTS AND PROCEEDINGS

J.P.W. is the father and V.F. the mother of two minor sons, J.W. and W.W. Both parents and children are Alaska Natives. After the family moved from Hoonah to Juneau in 1989, both J.P.W. and V.F. began having serious problems with alcohol. By September 1990, J.P.W. was living in the streets, while V.F. and the children were living at a shelter.

The State of Alaska, Department of Health and Social Services, Division of Family and Youth Services (State or DFYS) took the children into emergency custody in September 1990, after the Juneau Police Department (JPD) notified DFYS that the children had been abandoned at the shelter while both parents were "intoxicated walking the streets." In January 1991 the children were adjudicated children in need of aid under AS

47.10.010(a)(2)(A).[1] They have been in continuous State custody since then.

DFYS initially contemplated the eventual reunification of the family. After efforts to rehabilitate the parents failed, however, the case plan was changed from reunification to termination of parental rights. In April 1995 the superior court again determined that the children were children in need of aid, this time on the basis of parental neglect under AS 47.10.010(a)(2)(F)[2], and ordered that the parental rights of J.P.W. and V.F. be terminated as to both children. J.P.W. appeals.

### III. DISCUSSION

#### A. Standard of Review.

■■■ On appeal J.P.W. argues that the superior court erred in three of its findings. We review the findings of the superior court under the "clearly erroneous" standard; we will overturn such findings only if, after reviewing the entire record, we are left with a definite and firm conviction that a mistake has been made. E.J.S. v. State, 754 P.2d 749, 750 n. 2 (Alaska 1988). However, if a question of statutory interpretation is raised, we will apply our independent judgment and adopt the rule of law that is most persuasive in light of precedent, reason, and policy. In re J.L.F., 828 P.2d 166, 168 n. 5 (Alaska 1992), overruled on other grounds by In re S.A., 912 P.2d 1235, 1241 (Alaska 1996).

#### B. The Trial Court Did Not Err in Finding that the Children Were Children in Need of Aid on the Basis of Neglect as a Result of Their Father's Conduct.

A child may be adjudicated in need of aid on the basis of "the child having suffered substantial physical abuse or neglect as a result of conditions created by the child's parent, guardian, or custodian." AS 47.10.010(a)(2)(F). The superior court determined that the children were in need of aid "as a result of having suffered substantial neglect because of conditions created by the parents, i.e., their failure to provide the necessary food, care, clothing and shelter."

■■■ This determination is supported by clear and convincing evidence in the record,[3] as summarized in two of the findings of the court:

2.1. On September 9, 1990, the evening that DFYS first took custody of [J.W. and W.W.],[4] [J.P.W. and V.F.] were with their children in downtown Juneau in a very intoxicated state and were determined by the police to be in no condition to care for those children.

. . . .

2.4. On July 1, 1991, at 12:45 a.m., [J.P.W. and V.F.] were found with their children under the parking garage in downtown Juneau when the children were supposed to have been returned to the care of the foster parents. It was hazardous to reach this area because of the large boulders and debris at the entrance. The area itself was a health hazard due to the unsanitary conditions and communicable disease of the people known to frequent the area. When the children were found, they were awake and out of bed while their parents were in bed, asleep and intoxicated. The children were inadequately clothed and fed and were potentially at

---

1. Sec. 47.10.010. Jurisdiction. (a) Proceedings relating to a minor under 18 years of age residing or found in the state are governed by this chapter, except as otherwise provided in this chapter, when the court finds the minor

 (2) to be a child in need of aid as a result of
 (A) the child ... having no parent, guardian, custodian or relative caring or willing to provide care, including physical abandonment by
 (i) both parents....

2. (F) the child having suffered substantial physical abuse or neglect as a result of conditions created by the child's parent, guardian, or custodian.

3. The superior court's determination that the children were in need of aid as a result of parental conduct must be supported by clear and convincing evidence. R.C. v. State, 760 P.2d 501, 504 (Alaska 1988).

4. The abandonment of the children at the shelter later that night, which was the basis for DFYS's initial assumption of custody over the children, was a separate incident. The officer who had found the parents and children in downtown Juneau earlier in the night had left the children in their grandmother's custody and had told J.P.W. and V.F. that they could pick the children up in the morning when sober.

risk of harm from other individuals in the area.

Clear and convincing evidence in the record supports the superior court's determination that J.P.W. created conditions on these two occasions that resulted in the substantial neglect of the children. J.W. and W.W. were "two small children" at the time of the first incident, one five years old and the other less than two; J.P.W. exposed these children to the dangers of a downtown area at a time when he was "very intoxicated" and unable to care for them. J.P.W.'s inability to provide adequate parental care and supervision for the children at the time can be inferred from the fact that the responding police officer determined that it was necessary to leave the children in their grandmother's custody for the night. In the second incident, J.P.W. exposed the children to the hazards of an unlit area littered with broken bottles and feces and inhabited by people with tuberculosis and scabies. When a JPD officer found the family, both children were inadequately dressed and complained of being extremely hungry; they were taken to the police station to be dressed, fed, and warmed.

The superior court's finding that the children were in need of aid on the basis of substantial neglect is supported by clear and convincing evidence; it is not clearly erroneous.

C. *The Trial Court Did Not Err in Finding by Clear and Convincing Evidence that the Parental Conduct Was Likely to Continue.*

■ A termination of parental status is clearly erroneous if "[s]ufficient evidence does not exist to support the conclusion that the parental conduct which resulted in the determination that the children were in need of aid was likely to continue." *In re R.K.,* 851 P.2d 62, 66 (Alaska 1993).

■ The superior court determined that the conduct of J.P.W. that led to the neglect of the children was likely to continue, and supported this determination with the following finding:

4. The main parental conduct that causes the conditions leading up to the neglect of the children is severe and chronic substance abuse of [V.F. and J.P.W.]. This conduct is likely to continue because after four and a half years of state involvement, the parents have been unable to maintain sobriety for any demonstrated length of time. The facts leading up to this conclusion include:

. . . .

4.2. [J.P.W.] has a history of doing well when institutionalized and then returning to his previous behavior when released. After [J.P.W.'s] alcohol relapse within days of his return from [a halfway house] in January 1992, it was one and a half years before he entered an in-patient treatment program. Even then, he was unable to complete the program or maintain an alcohol or drug-free lifestyle. A psychological report prepared at [J.P.W.'s] request states that [J.P.W.] continues to choose relationships that doom his ability to succeed, and that his present fiance [sic] suffers from alcohol abuse problems and has difficulty maintaining sobriety. The evaluation recommends that [J.P.W.] attend a long term residential chemical abuse treatment program such as Akeela House in order to change his faulty reasoning patterns. The report concludes that "the progress for such a change is guarded to poor based on history and his present psychological stance."

Evidence in the record supports this finding and provides clear and convincing support[5] for the superior court's determination that the conduct of J.P.W. that caused the substantial neglect of the children will likely continue.

■ "[M]ental illness alone is not conduct and may not form the basis of a termination order." *K.N. v. State,* 856 P.2d 468, 475 (Alaska 1993); *see Nada A. v. State,* 660 P.2d 436, 440 (Alaska 1983) ("impulsive personality disorder" not conduct). J.P.W. argues

5. Like the determination that the children were in need of aid as a result of parental conduct, the superior court's determination that the parental conduct is likely to continue must be supported by clear and convincing evidence. *R.C. v. State,* 760 P.2d 501, 504 (Alaska 1988).

that alcoholism is an illness, that *K.N.* and *Nada A.* require that a "termination of parental rights must be based on *conduct,* not on a *diagnosis,*" and that "alcohol abuse in and of itself does not ... constitute *parental conduct* by [J.P.W.]."

The State responds by correctly observing that, while mental illness *alone* cannot form the basis of a termination order, when "the record links the [parent's] continuing mental illness with his past instances of extreme neglect" there may be a basis for finding that "improper parental conduct [is] likely to continue." *K.N.,* 856 P.2d at 475. The State argues there is such a link in this case.

▮ The State's reliance on *K.N.* is not necessary, however, because the superior court did not base its termination decision on "continuing mental illness." The superior court did not base its decision on J.P.W.'s alcoholism itself, but on his "severe and chronic substance abuse." Substance abuse is conduct, even if the alcoholism that may underlie it is an illness. Because the superior court based its termination order on willful parental conduct, we need not consider the issue of "continuing mental illness."

J.P.W. also argues that the two episodes of neglect that led the court to determine that the children were in need of aid were isolated episodes so limited in extent and duration as to defeat any predictive finding regarding continuing parental conduct. In *R.K.,* where "the state's case [was] based on one episode of neglect," we held that "the evidence of ... neglect [was] too limited both as to its extent and duration to sustain a prediction by clear and convincing evidence that [the parent was] likely to continue to be unable to provide appropriate parental care for the children." 851 P.2d at 66.

While the episodes of neglect that led to the child in need of aid determination in this case were also limited in extent and duration, *R.K.* is distinguishable. The key difference is that the predictive finding in *R.K.* was based solely on the single episode of neglect itself; the trial court did not support its predictive finding with any further evidence, but merely relied on its own assessment of the parent's level of "insight" into his problems. *Id.* at 65–66. In contrast, there is

considerable evidence supporting the superior court's predictive finding that J.P.W.'s conduct would likely continue. The court did not base its predictive finding solely on the two isolated incidents of neglect that formed the basis for the determination that the children were in need of aid.

Clear and convincing evidence supports the superior court's prediction that J.P.W.'s substance abuse is likely to continue. In *R.K.,* the father claimed that he no longer used the illegal drugs and alcohol that led to the isolated incident of neglect; this claim was not contradicted by the state, and its truthfulness was left to possible future monitoring to determine. *Id.* at 66–67. In contrast, J.P.W. makes no such claim on appeal; instead, it is his continued inability "to maintain sobriety for any demonstrated length of time" that is uncontradicted on the record. While the father in *R.K.* had "never been given a chance to demonstrate his conduct after the night in question," *id.* at 66, J.P.W.'s ongoing conduct is well-documented in the record.

As the superior court observed, J.P.W. "has a history of doing well when institutionalized and then returning to his previous behavior when released." J.P.W. was incarcerated two days after DFYS first took custody of the children; he was released from a halfway house in April 1991 and was drinking again by July, when he was found under the parking garage with the children. After another period of incarceration, J.P.W. was released from the halfway house in January 1992. Within days he returned to drinking and was incarcerated in January and March on twelve hour protective custody holds. After another stay in the halfway house, J.P.W. went to Anchorage and entered an inpatient alcohol treatment program in mid–1993, which he failed to complete. After leaving this program, he continued to drink.

A January 1995 psychological evaluation of J.P.W. concluded that "[u]ntil [J.P.W.] accepts that it is his responsibility to stay sober and establish the foundation for a stable life, [he] will stay stuck in a Catch–22 largely of his own making." It found that the progno-

sis for change was "guarded to poor based on history and his present psychological stance."

This evidence provides clear and convincing support for the superior court's predictive finding that J.P.W. is likely to continue engaging in severe substance abuse, the conduct that resulted in the neglect of the children.[6]

### D. *The Trial Court Did Not Err in Finding that the State Had Made Active Remedial Efforts.*

 Because J.W. and W.W. are Alaska Native children, the Indian Child Welfare Act (ICWA), 25 U.S.C. § 1901 *et seq.*, prohibits the termination of J.P.W.'s parental rights to these children unless the State can show that "active efforts have been made to provide remedial services and rehabilitative programs" to preserve the family that have proven unsuccessful.[7] 25 U.S.C. § 1912(d) (1988). J.P.W. concedes that the State made active efforts to help him secure aid and housing. He argues, however, that "*[a]bsolutely nothing* was done in the realm of active efforts to deal with the root problem—alcohol."

 "[F]or purposes of determining the sufficiency of the State's remedial efforts, the superior court may properly consider a parent's demonstrated lack of willingness to participate in treatment." *A.M. v. State*, 891 P.2d 815, 827 (Alaska 1995), *overruled on other grounds by In re S.A.*, 912 P.2d 1235, 1241 (Alaska 1996). However, this lack of willingness cannot be assumed until after the State has already made active efforts to provide remedial or rehabilitative services:

We have never suggested that the scope of the State's duty to make active remedial efforts should be affected by a parent's

motivation or prognosis before remedial efforts have commenced. To vary the scope of the State's ICWA duty based on subjective, pre-intervention criteria such as a parent's motivation or treatment prognosis might defeat the purpose of the active remedial effort requirement, for it would allow the State to argue, in all doubtful and difficult cases, that it had no duty to make active remedial efforts.

*A.M.*, 891 P.2d at 827. The State made sufficiently active remedial efforts initially, when J.P.W. was in Juneau. While its efforts after J.P.W. came to Anchorage were less active, these less active efforts were justifiable in light of J.P.W.'s continuing unwillingness to participate in treatment in any meaningful or ongoing way.

The State did make active remedial efforts to rehabilitate J.P.W. initially. DFYS took active steps to supplement the treatment J.P.W. received while incarcerated and facilitate treatment after he was released. DFYS provided him with transportation assistance so he could attend AA meetings. DFYS tried to steer him towards a Native sobriety group when it concluded that this group would provide a more effective support group for him. In preparation for J.P.W.'s release from the halfway house, DFYS contacted and met with a substance abuse officer for the City and Borough of Juneau who was assigned to the apartments where J.P.W. was to have lived. Finally, after J.P.W.'s post-release relapse, a DFYS social worker tried on a number of occasions to reinitiate contact with J.P.W. when J.P.W. was encountered in the streets. These efforts were sufficiently active to meet the requirements of the ICWA.

---

**6.** In addition to providing the necessary clear and convincing support for the finding that the parental conduct resulting in the neglect is likely to continue, the record also supports the inference that the actual neglect itself is likely to continue as well. While trapped in the "Catch 22" of his alcohol problems, J.P.W. has failed to maintain visitation with the children or communicate with them on a regular basis; he has disappeared from their lives without explanation on a number of occasions, once for as long as a year. Whether these failures constitute neglect in and of themselves, they suggest that, if J.P.W.

has been unable to meet even these minimal responsibilities towards the children, he would be even more likely to fail at the more involved responsibilities of providing adequate food, care, clothing, and shelter for the children.

**7.** The State must make this showing by a preponderance of the evidence. *A.M. v. State*, 891 P.2d 815, 826 (Alaska 1995), *overruled on other grounds by In re S.A.*, 912 P.2d 1235, 1241 (Alaska 1996).

The State did make some efforts after J.P.W. came to Anchorage and entered the inpatient treatment program. DFYS actively sought out J.P.W. after contact with him was lost, and, once contact was regained, DFYS set up a telephone visitation plan so J.P.W. could communicate with his children while undergoing treatment. These efforts were less active than the efforts in Juneau had been, however. DFYS sought out J.P.W. only after J.W. asked what had happened to his father; essentially, DFYS had let itself lose contact with J.P.W. before then. While J.P.W. was in the inpatient alcohol treatment program, DFYS did not send any DFYS workers in Anchorage to monitor his treatment, and failed to contact the treatment center itself. DFYS simply relied on the court system to "assure that he would follow through," since J.P.W.'s attendance in the program was court-ordered; it took no active steps to ensure this follow-through itself. DFYS did not contact either the district attorney's office or the city to see to it that J.P.W. was complying with the order. Finally, after J.P.W. left the program, DFYS neither obtained a discharge summary nor coordinated any efforts with the city regarding J.P.W.'s failure to complete his treatment. Arguably the efforts DFYS made to facilitate J.P.W.'s rehabilitation after he came to Anchorage were not sufficiently "active" efforts for ICWA purposes.

J.P.W.'s continued unwillingness to participate in treatment in any meaningful way must be considered in determining the sufficiency of the State's remedial efforts after he came to Anchorage, however. By the time J.P.W. came to Anchorage, he had already demonstrated to DFYS that he was unwilling to meaningfully participate in treatment. He had been assigned to counseling, but had refused to attend. A 1991 alcohol assessment had recommended that he receive inpatient treatment, but he had been unwilling to enter such a treatment program. After his relapse within days of his January 1992 release from the halfway house, J.P.W. had avoided contact with DFYS, despite the efforts of DFYS to reinitiate contact. J.P.W. told a social worker at DFYS that he did not want to attend the Anchorage inpatient treatment program, and the social worker

told him he did not have a choice. By the time J.P.W. came to Anchorage, he had demonstrated his unequivocal unwillingness to participate in treatment on a number of occasions. DFYS had made active rehabilitative efforts in the past. J.P.W.'s ongoing unwillingness to participate in treatment justified the State's failure to pursue aggressive remedial efforts once he came to Anchorage.

A preponderance of the evidence supports the finding that the State made active remedial and rehabilitative efforts, thereby satisfying ICWA requirements.

## IV. CONCLUSION

The judgment of the superior court is AFFIRMED.