945 P.2d 296 (1997)
A.M., Appellant,
v.
STATE of Alaska, Appellee.
No. S-7720.
Supreme Court of Alaska.
September 12, 1997.
*298 Philip M. Pallenberg, Assistant Public Defender, Juneau, and Barbara K. Brink, Acting Public Defender, Anchorage, for Appellant.
Jan A. Rutherdale, Assistant Attorney General, and Bruce M. Botelho, Attorney General, Juneau, for Appellee.
Before COMPTON, C.J., and MATTHEWS, EASTAUGH, FABE and BRYNER, JJ.

*297 OPINION

BRYNER, Justice.
In A.M. v. State, 891 P.2d 815, 828 (Alaska 1995), overruled in part by In re S.A., 912 *299 P.2d 1235, 1241 (Alaska 1996), we reversed a superior court order terminating A.M.'s parental rights to his children, M.M. and S.M., on the ground of abandonment. We remanded for consideration of a different potential ground for termination: A.M.'s apparent inability to provide care for his children. Id. On remand, the superior court concluded that inability to provide care was not a viable ground for termination; the court nevertheless decided to terminate A.M.'s parental rights on three other grounds that it had not previously ruled on and that were not addressed by this court in A.M. A.M. appeals the renewed termination order. We affirm.

I. Facts and Proceedings

We summarized the background of this case in our earlier opinion:
[M.M. and S.M.] were born in 1987 and 1989 to A.M. and S.L.S. The children are Indian children within the meaning of the Indian Child Welfare Act (ICWA), 25 U.S.C. §§ 1901-23, 1951 (1988).
In 1990, A.M. was charged with, and later convicted of, sexually abusing S.S., a child of S.L.S. by a prior relationship who lived with A.M. and S.L.S. at the time. In March 1990, after the abuse was reported, the Division of Family and Youth Services (DFYS) arranged for S.L.S. and her three children to live in a women's shelter. Upon finding that S.L.S. had left the shelter and was not keeping S.S. from A.M., DFYS took emergency custody of S.S.S. L.S. entered an alcohol treatment program shortly thereafter; A.M. took custody of M.M. and S.M., with DFYS monitoring their situation.
In September 1990, A.M. was formally charged with sexually abusing S.S. M.M. and S.M. were taken from A.M. upon his arrest and were temporarily placed in the home of a maternal great aunt in Juneau with whom S.L.S. was staying. Not long thereafter, S.L.S. left the children with a baby sitter and failed to return. On October 23, 1990, DFYS petitioned for adjudication of S.M. and M.M. as children in need of aid.... A.M. and S.L.S. both stipulated that the children were in need of aid and that DFYS should assume custody for up to two years. A.M. was subsequently convicted of sexually abusing S.S. and was eventually sentenced to serve a total of ten years in prison, with one year suspended.
In June 1992, seventeen months after A.M. stipulated that M.M. and S.M. were children in need of aid, DFYS petitioned for termination of A.M.'s parental rights. Superior Court Judge Walter L. Carpeneti conducted a consolidated hearing on the adjudicative and dispositional aspects of the [s]tate's petition to terminate. On August 6, 1993, Judge Carpeneti entered an order terminating A.M.'s parental rights.
A.M., 891 P.2d at 818-19 (footnote omitted).
In originally ordering parental rights terminated, the superior court concluded that A.M. abandoned his children, thereby making them children in need of aid (CINA) under subsection (1) of Alaska's CINA statute, AS 47.10.010(a).[1]A.M., 891 P.2d at 819-20. The trial court further concluded that A.M.'s conduct toward his children was likely to continue if A.M.'s parental rights were not terminated.[2]Id. at 825.
*300 On appeal, we found that the evidence at trial did not establish abandonment.[3]Id. at 821-24. Nevertheless, based on the trial court's findings, we concluded that a CINA adjudication (and consequently termination of parental rights) might be justified on an alternative theory under subsection (1): inability to provide care. Id. at 824. We remanded to the superior court for further consideration of this alternative ground. Id. at 824-25.
While A.M.'s case was pending on remand, this court issued In re S.A., 912 P.2d 1235 (Alaska 1996), which partially overruled A.M. by holding that parental inability is not a proper ground for finding CINA status under subsection (1). Id. at 1242.[4] In light of S.A., the superior court concluded on remand that A.M.'s inability to care for his children was not a valid ground for CINA adjudication or termination of parental rights.
Nevertheless, over A.M.'s objections, the superior court went on to find that the parental conduct it originally relied on to find abandonment would alternatively establish grounds for CINA adjudication under three other subsections of AS 47.10.010(a): subsection (3) (imminent risk of physical harm); subsection (4) (imminent danger of sexual abuse); and subsection (6) (substantial physical abuse or neglect).[5] After determining that the State had made sufficient efforts to avoid termination and that A.M.'s conduct was likely to continue, the court again ordered A.M.'s parental rights terminated. A.M. again appeals, raising a number of procedural and substantive challenges to the renewed termination order.

II. Discussion

A. Did the Superior Court Exceed the Scope of the Remand?

A.M. first argues that the trial court exceeded the scope of the mandate on remand by finding M.M. and S.M. CINA under subsections AS 47.10.010(a)(3), (4), and (6). A.M. contends that the mandate in A.M. specifically limited the trial court to considering CINA status under subsection AS 47.10.010(a)(1), thereby precluding consideration of CINA status under subsections (3), (4), and (6). The State responds that the superior court's consideration of subsections (3), (4), and (6) was not inconsistent with the mandate of A.M. and was therefore permissible.
This argument presents a question of law, see Gaudiane v. Lundgren, 754 P.2d 742, 744 (Alaska 1988); cf. Guin v. Ha, 591 P.2d 1281, 1284 & n. 6 (Alaska 1979), which we review de novo. See O.R. v. State, Dep't of Health and Soc. Services, 932 P.2d 1303, 1307 n. 1 (Alaska 1997).
A trial court has no authority to deviate from a specific mandate[6] of the supreme court but may take actions not inconsistent *301 with our decision. Gaudiane, 754 P.2d at 744 (citing King v. Alaska State Hous. Auth., 571 P.2d 1010, 1011-12 (Alaska 1977)). A trial court must also act consistently with a general mandate. See King, 571 P.2d at 1012.
Our opinion in A.M. ended with the following language:
The superior court's finding of abandonment was clearly erroneous; this error requires that the order of August 6, 1993, terminating A.M.'s parental rights be vacated. A remand is necessary, however, for further proceedings to determine whether A.M.'s children should be adjudicated CINA due to A.M.'s inability to provide care and, if so, whether termination of parental rights is warranted under that theory....
Accordingly, the order terminating A.M.'s parental rights is VACATED, and this case is REMANDED for further proceedings consistent herewith.
A.M., 891 P.2d at 828.
A.M. correctly argues that this mandate required the trial court "to determine [under AS 47.10.010(a)(1)] whether A.M.'s children should be adjudicated CINA due to A.M.'s inability to provide care." Id. The trial court unquestionably complied with this requirement: on remand, the court considered adjudicating the children CINA under subsection (1) due to A.M.'s inability to provide care; it correctly recognized that this option was foreclosed by our newly announced decision in S.A., 912 P.2d 1235 (Alaska 1996).
A.M. would have us hold that the mandate in our prior opinion empowered the trial court to do nothing further after it rejected inability to provide care as a viable ground for CINA adjudication. But a careful look at the mandate fails to confirm A.M.'s contention: nothing in the mandate foreclosed the trial court from considering whether A.M.'s children should be declared CINA on the alternative grounds specified in subsections (3), (4), and (6) of AS 47.10.010(a). To the contrary, the mandate broadly authorized any "further proceedings consistent herewith." Id.
The alternative grounds set out in subsections (3), (4), and (6) remained undecided upon remand: facts conforming to the subsections had been alleged in the original petition to terminate A.M.'s parental rights, and evidence addressing them had been presented at A.M.'s trial; the trial court had not resolved these theories in its original termination decision, and they remained unresolved in our opinion deciding A.M.'s first appeal. See generally A.M., 891 P.2d 815. Once the trial court complied with our specific direction to consider inability to provide care under subsection (1), its additional consideration of CINA jurisdiction under subsections (3), (4), and (6) was not inconsistent with A.M.'s mandate.
Moreover, any uncertainty as to the scope of the mandate in A.M. was resolved by our subsequent decision in S.A., 912 P.2d at 1241-42 & n. 7. While S.A. expressly overruled A.M.'s conclusion that inability to provide care was a viable theory of CINA jurisdiction under subsection (1), id. at 1241, S.A. expressly pointed out that this decision would not change the result in A.M. Id. at 1241-42 n. 7. In explaining this conclusion, we virtually invited the trial court in A.M.'s case to consider the alternative CINA grounds on remand:
The results we reached in A.M. ... would not change under our holding in this case.... In A.M., ... [w]e remanded the case for consideration of whether the father was able to care for the children. We noted:
The superior court specifically found, beyond a reasonable doubt, that A.M.'s daughter was likely to suffer sexual abuse if placed in his custody; that both children were likely to suffer physical abuse resulting from A.M.'s domestic violence; and that both were likely to suffer physical deprivation due to A.M.'s inability to meet their needs on a consistent, ongoing basis.
These findings would support CINA adjudications under subsections [(3), (4), and (6)], respectively.
Id. (citations omitted) (emphasis added).
Given the broad scope of the mandate in A.M. and the above quoted passage from *302 S.A., we conclude that the trial court did not exceed the scope of A.M.'s mandate in considering subsections (3), (4), and (6) on remand.

B. Did the Superior Court Violate A.M.'s Right to Procedural Due Process by Considering CINA Status under AS 47.10.010(a)(3), (4), and (6)?

A.M. next argues that the superior court violated his constitutional right to procedural due process[7] by failing to afford him notice on remand of its intent to address CINA status under AS 47.10.010(a)(3), (4), and (6) and by failing to allow him an opportunity to present additional evidence on these jurisdictional theories. The State replies that A.M. suffered no prejudice, "constitutionally or otherwise."
"Notice reasonably calculated to afford the parties an opportunity to present objections to a proceeding, and affording them a reasonable time to do so, is a fundamental requirement of due process." Kerr v. Kerr, 779 P.2d 341, 342 (Alaska 1989). Whether the superior court violated A.M.'s right to due process is a question of law, which this court reviews de novo. See DeVaney v. State, Dep't of Revenue, 928 P.2d 1198, 1200 (Alaska 1996).
Although the alternative CINA grounds set out in AS 47.10.010(a)(3), (4), and (6) may not have been actively argued at A.M.'s trial, they were alleged in the State's petition to terminate A.M.'s parental rights. A.M., 891 P.2d at 819. They were also addressed in evidence presented by the parties at the trial. Thus, from an evidentiary standpoint, CINA jurisdiction under these subsections had been fully litigated when this case returned to the trial court for further proceedings on remand.[8] Because A.M. had an opportunity to present evidence relating to these subsections at the original trial, he had no automatic right to present new evidence upon remand. See Murray v. Murray, 856 P.2d 463, 466 n. 1 (Alaska 1993).
After the case returned to the trial court, moreover, A.M. had ample notice that subsections (3), (4), and (6) were fair game on remand. As we have already pointed out, our opinion in S.A., 912 P.2d at 1241 n. 7, made the relevance of these subsections abundantly clear; the trial court discussed S.A. with the parties; and the State specifically requested the court to address the alternative CINA grounds. A.M. objected to the State's request exclusively on legal grounds, arguing, as he does here, that consideration of subsections (3), (4), and (6) would be beyond the scope of this court's mandate on remand. Even though A.M. requested and was allowed to produce new evidence on remand concerning other matters, he made no request to present additional evidence addressing the alternative subsections. Nor did A.M. seek reconsideration based on lack of notice after the superior court issued its decision invoking these provisions and again revoking A.M.'s parental rights.
While A.M. does make a belated offer of proof on appeal describing additional evidence he could present if an evidentiary hearing were now granted, this offer relates to events occurring after his release from prison. A.M. was not released until May 1996, many months after the conclusion of all hearings in his case and less than a month before the superior court issued its final written *303 decision on remand. Thus, even if the trial court had on its own initiative invited a full, post-remand evidentiary hearing on subsections (3), (4), and (6), A.M.'s newly-offered evidence would not yet have been available.
For all of these reasons, we find no merit to A.M.'s due process claim.

C. Did the Superior Court Clearly Err in Finding CINA Status Under AS 47.10.010(a)(3), (4), and (6)?

A.M. further claims that the superior court erred on remand in finding clear and convincing evidence that the children were CINA under AS 47.10.010(a)(3), (4), and (6). He argues that the record contains insufficient evidence to support a CINA finding under any of these subsections. In so arguing, however, A.M. covers territory we have already visited.
In concluding on remand that A.M.'s children were CINA under subsections (3), (4), and (6), the superior court readopted the factual findings it made after A.M.'s trial; the court then shifted its analysis from the termination criteria it originally considered  which involved abandonment under CINA subsection (1)  to the specific requirements of subsections (3), (4), and (6). The court concluded that its original findings fit these requirements.[9]
In A.M., 891 P.2d at 820, we specifically addressed the findings upon which the superior court based its original termination decision:
In reaching the conclusion that A.M. had consciously disregarded his parental obligations to M.M. and S.M., the court focused on A.M.'s pre-incarceration conduct, which included
his long history of severe drug and alcohol abuse, his long history of committing crimes (including sexual abuse of his stepdaughter), his inability to provide consistent support and nurture for his children, his constant moving of the children, his long history of physical attacks upon their mother, and numerous episodes of leaving the children for substantial periods.
We expressly found these findings to be supported by the record and not clearly erroneous. Id. at 821.
We went on to quote an additional passage from the superior court's original findings:
[A.M.] is highly likely to continue to abuse drugs and alcohol, to commit crimes (especially assaultive crimes in the context of domestic disputes and sexual offenses against children, but also property crimes given his extensive criminal record, his lack of success in substance abuse treatment, his poor prognosis for sexual offender treatment, his failure even to obtain anger management counseling, and his characterological problems).
Id. at 825. Again, we expressly found these findings to be supported by the record and not clearly erroneous. Id.
Here, A.M. emphasizes portions of the trial record that support his own view of the evidence. He argues, as he did in his original appeal, that there is insufficient evidence to support a CINA adjudication. But we addressed and disposed of essentially the same argument in A.M., 891 P.2d at 825: "Although A.M. points to contrary evidence that he presented, it is not this court's job to reweigh the evidence when the record provides clear support for the superior court's ruling." This statement is as pertinent to the superior court's findings under subsections (3), (4), and (6) as it was to the court's original findings under subsection (1)'s abandonment clause, for the findings are the same in both statutory contexts, and A.M.'s quarrel is with the findings themselves, not with their application in a new statutory context.
In termination of parental rights cases, we review the trial court's factual findings for clear error, reversing those findings only if our review of the entire record leaves *304 us with a definite and firm conviction that a mistake was made. In re J.W., 921 P.2d 604, 606 (Alaska 1996) (citing E.J.S. v. State, 754 P.2d 749, 750 n. 2 (Alaska 1988)). Applying this standard, we conclude that the superior court's findings on remand were not clearly erroneous and that they support CINA adjudication under subsections (3), (4), and (6) of AS 47.10.010(a) and termination under AS 47.10.080(c)(3).

D. Did the Superior Court Err in Finding that the State Complied with ICWA's Requirement of Active Remedial Efforts?

A.M.'s final claim relates to the adequacy of the State's efforts to prevent the breakup of his family. A.M.'s children are Indian children within the meaning of the Indian Child Welfare Act (ICWA), 25 U.S.C. §§ 1901-23, 1951 (1988). Under ICWA § 102(d), 25 U.S.C. § 1912(d) (1988), the State was required to prove by a preponderance of the evidence that "active efforts" were made "to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and that these efforts ... proved unsuccessful." See A.M., 891 P.2d at 826. See also CINA Rule 18(c)(2); In re J.W., 921 P.2d 604, 609 (Alaska 1996).[10]
Our first decision in this case summarized the superior court's original findings on the active remedial efforts issue as follows:
The superior court found that DFYS had "made active efforts to provide remedial services and rehabilitative programs to prevent the breakup of this family but those efforts have proved unsuccessful...." In the superior court's view, the [s]tate had done everything "feasible given [A.M.'s] incarceration status...." In reaching this conclusion, the court observed that "[A.M.] has expressed a willingness and desire to undergo sex offender treatment while incarcerated, but substantial doubt on the motivation of that expressed willingness was raised by the [s]tate's expert witnesses. The court concludes that [A.M.] is not sincerely interested in changing his deviant sexual behavior...."
A.M., 891 P.2d at 826 (footnote omitted).
In the first appeal, A.M. challenged the trial court's findings, contending that the State had failed to meet its burden of proving active remedial efforts. In response, the State argued that, given A.M.'s incarceration and poor motivation for treatment, "[DFYS] fulfilled its duty of making active efforts to provide remedial services" simply "by preparing a reunification plan and encouraging A.M. to seek services available within the institution." Id. at 827. We rejected the State's argument, holding that "[n]either incarceration nor doubtful prospects for rehabilitation will relieve the [s]tate of its duty under ICWA to make active remedial efforts." Id.
Although we acknowledged that both incarceration and a demonstrated lack of willingness to participate in treatment are relevant factors in determining the reasonableness of the State's remedial efforts, id., we cautioned that
[w]e have never suggested that the scope of the [s]tate's duty to make active remedial efforts should be affected by a parent's motivation or prognosis before remedial efforts have commenced. To vary the scope of the [s]tate's ICWA duty based on subjective, pre-intervention criteria such as a parent's motivation or treatment prognosis might defeat the purpose of the active remedial effort requirement.
Id.
Given the trial court's emphasis on A.M.'s predictedly poor but apparently untested prospects for rehabilitation, we concluded that the finding of ICWA compliance was problematic:
In the present case, the superior court's finding of compliance with the ICWA requirement presents a close question, particularly *305 because the court's assessment of the active efforts that the [s]tate should have made was apparently influenced by its perception that, despite his avowed willingness to participate in treatment, A.M. had made no genuine commitment to rehabilitation and his prospects for rehabilitation were poor.
Id. Since a remand was necessary in any event, we ordered the trial court to reconsider the issue in light of our concerns. Id.
On remand, the superior court heard updated evidence on the active remedial efforts issue. By that time, A.M.'s potential for rehabilitation was no longer conjectural: a DFYS social worker, a DFYS supervisor, a counselor from the Hiland Mountain Correctional Center's sexual offender treatment program, and a counselor from the Wildwood Correctional Center's alcohol and drug abuse program testified that A.M. had enrolled in institutional sexual offender and substance abuse treatment programs and had been discharged from both for failure to comply with treatment requirements. A.M.'s substance abuse counselor specifically testified that A.M. had no real interest in treatment, but was only going through the motions. Other testimony revealed that A.M.'s efforts in the sexual offender program had earned a rating of zero on a scale of 0 to 5 for active participation.
In light of this evidence, the trial court found that "A.M. remains an untreated sex offender and a serious substance abuser." The court further found it "appropriate to consider [A.M.'s] unwillingness to do the work required by those programs." On this basis, the court concluded "that the State met the requirements of the Indian Child Welfare Act to make active efforts to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and that these efforts have proved unsuccessful." While acknowledging that DFYS itself did little more than promulgate a plan for reunification and facilitate A.M.'s visitations with his children, the trial court found that there was little more DFYS could have done under the circumstances; in the court's view, additional efforts by DFYS "would have been superfluous and probably counterproductive."
A.M. challenges this finding and questions anew the adequacy of the State's remedial efforts. A.M. insists that DFYS had a duty to intervene actively on his behalf while he was in treatment, so as to maximize his chances of success. We find this argument unpersuasive.
The measure of ICWA compliance is whether the State made "active efforts ... to provide [A.M.] remedial services and rehabilitative programs" in order "to prevent the breakup of [his] family." 25 U.S.C. § 1912(d). It is undisputed that the services and programs A.M. needed most to promote his rehabilitation and eventual reunification with his children consisted of sexual offender and substance abuse treatment programs. The record unequivocally establishes that the State provided these programs to A.M. in prison. The State classified A.M. to institutions where the programs were available; the State accepted and enrolled him in the programs; and the State kept him in treatment until his own disinterest led to termination. These were "active efforts" by the State, and they plainly entailed "remedial services and rehabilitative programs."
It is of no particular consequence that the Department of Corrections (DOC), rather than DFYS, made these active remedial efforts. As a sentenced prisoner, A.M. was committed to DOC's care and custody; by law, DOC was the state agency with primary responsibility for his successful rehabilitation. See, e.g., Rust v. State, 582 P.2d 134, 137-38 (Alaska 1978).[11] We need not speculate *306 what active reunification efforts DFYS might have been required to make if A.M. had not actually enrolled in appropriate DOC treatment programs. A.M.'s enrollment in the DOC programs necessarily reduced DFYS's role in providing active remedial efforts. Active intrusion by DFYS into DOC's therapeutic programs would have been inappropriate and unreasonable, if not impermissible as a matter of law and impossible as a matter of practical reality. The record on remand establishes that DFYS maintained contact with A.M. while he was in treatment, generally encouraged his treatment efforts, and assisted him in arranging visitation with his children. The record supports the superior court's finding that additional DFYS efforts would have been superfluous.
Our chief concern in remanding the ICWA issue for reconsideration was that the trial court might have determined the scope of the State's duty to make active remedial efforts, not by consideration of A.M.'s "demonstrated lack of willingness to participate in treatment" but rather by reference to "subjective, pre-intervention criteria" relating to A.M.'s "motivation or treatment prognosis." A.M., 891 P.2d at 827. This concern has been laid to rest by A.M.'s failure in sexual offender and substance abuse treatment programs. The current record provides ample support for the conclusion that A.M. has now "demonstrated [his] lack of willingness to participate in treatment." Id. The superior court properly considered this factor in deciding that the State owed no further duty to make active remedial efforts. Id.; see also In re J.W., 921 P.2d at 610.
In A.M., 891 P.2d at 826 n. 12, we cited the distinction between "active efforts" and "passive efforts" drawn by Craig J. Dorsay, The Indian Child Welfare Act and Laws Affecting Indian Juveniles Manual 157-58 (1984). According to Dorsay, passive efforts entail merely drawing up a reunification plan and requiring the "client" to use "his or her own resources to[] bring[] it to fruition." Dorsay at 157-58. Active efforts, on the other hand, include "tak[ing] the client through the steps of the plan rather than requiring the plan be performed on its own." Id. The overall efforts made by the State in this case  including DOC's enrollment and supervision of A.M. in two institutional treatment programs  fall decidedly closer to Dorsay's notion of "active efforts" than to his description of "passive efforts."
Ultimately, of course, there can be no pat formula for distinguishing between "active efforts" and "passive efforts" under 25 U.S.C. § 1912(d).[12] Although we remain troubled by the relative passivity of DFYS's remedial efforts at the early stages of this case, our review of the record convinces us that the trial court did not err in concluding that the agency's efforts before and while A.M. was in treatment, coupled with DOC's actual provision of appropriate and substantial treatment services, satisfied the State's duty under ICWA to make active remedial efforts.

*307 III. Conclusion

We AFFIRM the superior court's order on remand terminating A.M.'s parental rights.
NOTES
[1] AS 47.10.010(a)(1) currently provides that the court may find a minor to be a child in need of aid as the result of the child "having no parent, guardian, custodian, or relative caring or willing to provide care, including physical abandonment by ... both parents."

When this case was tried, CINA status was defined in former subsections (a)(2)(A)-(F) of AS 47.10.010. In finding CINA status based on abandonment, the superior court relied on former AS 47.10.010(a)(2)(A). Subsequently, the legislature repealed AS 47.10.010(a)(1). The definitions of CINA status previously set out in subsections (a)(2)(A)-(F) were retained verbatim but were renumbered as AS 47.10.010(a)(1)-(6). AS 47.10.010(a)(1) is thus the current counterpart of former AS 47.10.010(a)(2)(A). For simplicity's sake, we will refer to the current statutory numbering throughout this opinion.
[2] Under AS 47.10.080(c)(3), the court is authorized to terminate parental rights

upon a showing ... by clear and convincing evidence that there is a child in need of aid under AS 47.10.010(a) as a result of parental conduct and upon a showing ... by clear and convincing evidence that the parental conduct is likely to continue to exist if there is no termination of parental rights.
[3] The test for abandonment required the superior court to make two findings: (1) that the parent's conduct implied a conscious disregard for parental obligations and (2) that the parent's conscious disregard led to the destruction of the relationship between the parent and children. Id. at 820. Although we found ample evidence to support the trial court's finding that A.M. consciously disregarded his parental obligations, we determined that the evidence did not support the court's finding that A.M.'s conscious disregard led to the destruction of his parental relationship with his children. Id. at 821, 824 (citation omitted).
[4] We said, in relevant part:

We hold that a child may not be adjudicated CINA under AS 47.10.010(a)(2)(A) on the grounds that the child's parent or caregiver is unable to care for the child if the parent or caregiver is willing to care for the child.
S.A., 912 P.2d at 1242.
[5] Under AS 47.10.010(a)(3), (4), and (6), the court may make a CINA finding as a result of:

(3) the child having suffered substantial physical harm or if there is an imminent and substantial risk that the child will suffer such harm as a result of the actions done by or conditions created by the child's parent ...;
(4) the child ... being in imminent and substantial danger of being ... sexually abused ... by the child's parent ...;
....
(6) the child having suffered substantial physical abuse or neglect as a result of conditions created by the child's parent.
[6] We have defined specific mandates to include appellate court decisions that direct trial courts to "determine one particular issue ... or to limit proceedings to ... taking specific evidence." King v. Alaska State Hous. Auth., 571 P.2d 1010, 1011-12 (Alaska 1977) (footnote omitted).
[7] Amendment XIV, section 1 of the United States Constitution instructs, in part, "No state shall ... deprive any person of life, liberty, or property, without due process of law."

Article I, section 7 of the Alaska Constitution provides, in part, "No person shall be deprived of life, liberty, or property, without the due process of law."
[8] In A.M., 891 P.2d at 819, we noted that the State had "alleged that A.M.'s children were in need of aid on the alternative grounds specified in AS 47.10.010(a)[(1), (3), (4), and (6)]," but we commented that "[t]he only theory actively argued by the [s]tate at the termination trial ... was abandonment under [subsection (1)]." In the current appeal, the State disputes the accuracy of the latter comment, insisting that the State did in fact actively argue the alternative jurisdictional theories at trial. However, the point is moot: regardless of whether these theories were actively argued, it is undisputed that they were properly alleged as grounds for CINA adjudication and were addressed by the parties' evidence at trial. They were thus fully litigated, even if the State and the trial court chose not to emphasize them in the final analysis of the case.
[9] For example, the superior court previously found "beyond a reasonable doubt, that A.M.'s daughter was likely to suffer sexual abuse if placed in his custody." A.M., 891 P.2d at 825. Readopting this finding, the superior court concluded on remand that the children were CINA under subsection (4) due to their being "in imminent and substantial danger of being ... sexually abused ... by [their] parent." AS 47.10.010(a)(4).
[10] Whether the superior court erred in finding the compliance with these requirements presents both a question of law and fact. We review the superior court's factual findings under the "clearly erroneous" standard. In re J.W., 921 P.2d at 606; see also O.R., 932 P.2d at 1307 n. 1 (Alaska 1997) (quoting A.M., 891 P.2d at 820). We review questions of law de novo. In re S.A., 912 P.2d at 1237.
[11] DOC's primacy over DFYS as a source of remedial services in this case is particularly clear given that A.M.'s rehabilitative needs as a criminal offender coincided with his reunification needs. The programs made available to A.M. in prison were thus programs that he needed to maximize the possibility of reuniting with his children.

We note that DOC's legal custody over A.M. and its responsibility for his rehabilitation serve to distinguish his situation from In re J.W., 921 P.2d 604, 610 (Alaska 1996), where we suggested that DFYS had failed to make active efforts, as required under ICWA, when it relied on the court system to monitor the progress of an alcoholic father who had enrolled, pursuant to court order, in an inpatient substance abuse program. The father in J.W. was not in state custody, and the court had no legal duty to promote his success in the treatment program.
[12] We note that other courts reviewing compliance with ICWA's active remedial efforts requirement have tended to take a case-by-case approach; their decisions thus provide minimal guidance. See, e.g., In re Baby Boy Doe, 127 Idaho 452, 902 P.2d 477, 484 (1995) ("[T]ypes of remedial and rehabilitative services to be required under subsection (d) depend on the facts of each case."). See also In re T.J.J., 366 N.W.2d 651, 656 (Minn.App. 1985) (finding efforts sufficiently active where social worker contacted mother on a monthly basis "to stimulate mother's interest ... with a goal of reuniting the family"); In re S.C., 833 P.2d 1249, 1257 (Okla. 1992) (finding that if this provision applied, efforts were sufficient where state conducted two home studies and promulgated a plan requiring the father to pay child support and visit the children, and father visited the children only once during pendency of the proceedings); In re E.M., 466 N.W.2d 168, 176 (S.D. 1991) (Henderson, J., dissenting) (rejecting the affirmance of a finding of sufficient efforts under 25 U.S.C. § 1912(d) where only one parenting class was offered); In re S.D., 402 N.W.2d 346, 351 (S.D. 1987) (holding that where evidence showed the state provided "food, shelter, medical treatment, clothing, and ... counseling services," but social worker had difficulty making services available, efforts were sufficient in light of parents' nomadic lifestyle).